# Baptist Homes, Inc. dba Son Valley v. City of Madison, MS, et al.

## Kianca Guyton

## November 3, 2025

All depositions & exhibits are available for downloading at
<<www.brookscourtreporting.com>>
Please call or e-mail depo@brookscourtreporting.com if you need a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

EXHIBIT 8

Kianca Guyton 11/3/2025

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


BAPTIST HOMES, INC. DBA
SON VALLEY

                                              PLAINTIFF


V.          CIVIL ACTION NO. 3L24-CV-00092-KHJ-MTP


CITY OF MADISON,
MISSISSIPPI, A MUNICIPAL
CORPORATION, AND
JANE-JOHN DOES I-X

                                             DEFENDANTS



30(b)(6) DEPOSITION OF CITY OF MADISON
{KIANCA GUYTON}


Taken at the instance of the Plaintiff at Wells,
Marble & Hurst, PLLC, 300 Concourse Blvd.,
Ridgeland, Mississippi 39157, on Monday,
November 3, 2025,
beginning at 9:30 a.m.




REPORTED BY:

ROBIN G. BURWELL, CCR #1651

Kianca Guyton 11/3/2025

```
 1    APPEARANCES:

 2

 3         KELLY H. STRINGER, ESQ.
           JOHN P. COTTINGHAM, ESQ.
 4         Maxey Wann, PLLC
           210 E. Capitol Street, Suite 2100
 5         Jackson, Mississippi 39201
           kelly@maxeywann.com
 6         jack@maxeywann.com

 7
                COUNSEL FOR PLAINTIFF
 8

 9
           KELLY D. SIMPKINS, ESQ.
10         Wells, Marble & Hurst, PLLC
           300 Concourse Blvd., Suite 200
11         Ridgeland, Mississippi 39157
           ksimpkins@wellsmarble.com
12

13         CHELSEA H. BRANNON, ESQ.
           City of Madison, Mississippi
14         1004 Madison Avenue
           Madison, Mississippi 39110
15         cbrannon@madisonthecity.com

16
                COUNSEL FOR DEFENDANTS
17

18

19

20

21

22

23

24

25
```

Kianca Guyton 11/3/2025

1                          INDEX

2   Style.......................................1

3   Appearances.................................2

4   Index   ....................................3

5   Certificate of Deponent  .................84

6   Certificate of Court Reporter ............85

7                       EXAMINATIONS

8   Examination By Ms. Stringer ...............4

9   Examination By Mr. Simpkins ..............81

10                        EXHIBITS

11  Exhibit 3 Re-Notice of 30(b)(6) ...........4

12          Deposition

13  Exhibit 4 Letter .........................13

14  Exhibit 5 Section 3.02 ...................28

15  Exhibit 6 Section 28.01 ..................32

16  Exhibit 7 December 14, 2023 Letter .......45

17  Exhibit 8 E-mail .........................59

18  Exhibit 9 Rental Inspection and ..........64

19          Property Licensing Application

20  Exhibit 10 Application Checklist and ......66

21          Fee Schedule

22  Exhibit 11 Madison-001 - 011 .............78

23

24

25

Kianca Guyton 11/3/2025

```
 1                    KIANCA GUYTON,
 2    having been first duly sworn, was examined and
 3    testified as follows:
 4    EXAMINATION BY MS. STRINGER:
 5         Q.   Will you state your full name for the
 6    record?
 7         A.   Kianca Guyton.
 8         Q.   Ms. Guyton, I introduced myself a minute
 9    ago.  My name is Kelly Stringer, and I am one of
10    the attorneys who represents Baptist Homes, d/b/a
11    Son Valley.  And I'm going to refer to Baptist
12    Homes today, but I'm referring to the same entity.
13              Let me -- I'm going to give you -- we've
14    noticed the 30(b)(6) deposition the City of
15    Madison.  This deposition started several months
16    ago and Chief Layton did a personal deposition and
17    partial 30(b)(6).
18              I'm going to hand what you was Exhibit 1
19    to his deposition, which was the Notice of
20    Deposition.  And then I'll mark this --
21              MS. STRINGER:  Kelly, I'm going to
22    continue the numbering from Chief Layton.
23              MR. SIMPKINS:  That's fine.
24              MS. STRINGER:  This will be Exhibit 3.
25              (Exhibit 3 marked for identification.)
```

Kianca Guyton 11/3/2025

1        Q.    (By Ms. Stringer)  Ms. Guyton, I filed a
2   Re-Notice of the 30(b)(6) only because it had been
3   several months that we could have one with the
4   correct date.
5            Have you seen either of these documents
6   before?
7        A.    (Examining.)
8            Yes.
9        Q.    I understand that you are being
10  designated to speak on behalf of the City of
11  Madison on these subject areas, with the exception
12  of the first part of subject matter number 4,
13  which was the investigation by the City of Madison
14  prior to June 1st, 2023; subject number 25 and 26,
15  which dealt with the roles and the knowledge of
16  the fire department.
17            Is that correct to your understanding?
18  Did I miss anything?
19            MR. SIMPKINS:  I'll answer for her on
20  that.  That is correct, although it's not accurate
21  to say that there would be no testimony that she
22  could provide as to what occurred prior to her
23  letter of June 1, 2023.
24            And also, of course, it's subject to
25  objections which we made, to which were agreed to,

Kianca Guyton 11/3/2025

1   we made in a May 23 letter to you and a May 27
2   response.  So subject to some of those objections,
3   we agreed we worked through as the deposition
4   proceeded.
5          MS. STRINGER:  Yes.  Hopefully, those
6   will not be an issue.
7      Q.   (By Ms. Stringer)  Ms. Guyton, have you
8   given a deposition before?
9      A.   Yes.
10     Q.   You're generally familiar with how the
11  process works then?
12     A.   Yes.
13     Q.   I will not go through all the rules of
14  depositions then since this is not your first time
15  to do this.
16          I will make my best effort not to speak
17  over you today if you'll give me the same
18  courtesy, and that will let us get a clean
19  transcript.  Agreeable?
20     A.   Yes.
21     Q.   And you understand we need to give
22  verbal answers so we can get a clean transcript as
23  well?
24     A.   Yes.
25     Q.   I am not one to extend depositions just

Kianca Guyton 11/3/2025

1    for the purpose of keeping you here for a long

2    time, but if you do need a break at any point,

3    just let me know.  That's not a problem.

4         A.   Yes.

5         Q.   Can we agree if I ask a question and you

6    don't understand it, please just tell me.  I will

7    rephrase it.  I will do my best to ask a better

8    question.  Is that agreed?

9         A.   Yes.

10        Q.   And if you do answer my question, I will

11   assume you did understand it.  Is that agreeable?

12        A.   Yes.

13        Q.   Ms. Guyton, I don't want to know

14   anything that you discussed with your legal

15   counsel.  But generally, in preparation for your

16   deposition today, did you review any

17   documentation?

18        A.   Yes.

19        Q.   Are you able to tell me what you

20   reviewed?

21        A.   So, for instance, these subject matter

22   areas, I did go through the zoning ordinance, the

23   findings that -- so like the letter I sent, the

24   letter that was sent.  What is it called when you

25   package everything?

Kianca Guyton 11/3/2025

```
1        Q.   The discovery -- part of the discovery
2   production.
3        A.   The discovery, I'm sorry, yes.  The
4   discovery production.
5        Q.   Did you review any of the -- well, I
6   believe you've been present at some of the
7   depositions in this case?
8        A.   Yes, I was present at one.
9        Q.   Did you review any of the -- what
10  deposition were you present at?
11       A.   Ron Morton.
12       Q.   Ron Morton.  I believe that was his
13  personal deposition and the 30(b)(6) of the
14  City -- of Baptist Homes.
15            Did you attend any other depositions?
16       A.   No.
17       Q.   Did you review any other deposition
18  testimony in preparation for the deposition today?
19       A.   Yes.
20       Q.   What deposition testimony do you recall
21  reviewing?
22       A.   Derrick Layton.
23       Q.   And that is the fire chief for the City
24  of Madison?
25       A.   Yes.
```

Kianca Guyton 11/3/2025

```
 1        Q.   I'm going to jump around a little bit in
 2   the subject matter areas.  I think it will just
 3   run a little more smoothly this morning.
 4             Are you currently employed with the City
 5   of Madison?
 6        A.   Yes.
 7        Q.   And what is your official title?
 8        A.   Director of community development and
 9   planning.
10        Q.   Does that fall under a specific
11   department within the City's organization?
12        A.   Community development.
13        Q.   Is it the community development
14   department?
15        A.   Yes.
16        Q.   And then as the director of community
17   development and planning, are you the head of that
18   department?
19        A.   Yes.
20        Q.   I do not need to know everything you do
21   on a daily basis, but will you give me a broad
22   overview of what your role is as the director of
23   community development and planning?
24        A.   I am the zoning administrator.  I am the
25   flood plain manager.  I'm the planning director,
```

Kianca Guyton 11/3/2025

```
 1   which means I receive -- and also as a zoning
 2   administrator, I receive all applications for site
 3   plans, dimensional variances, conditional uses,
 4   and I prep those documents for the planning zoning
 5   commission.  I direct meetings of the department
 6   heads to review submittals.  I am the manager of
 7   the rental department.  And under me is the
 8   director of environment and design.
 9              I enforce the zoning ordinance.  I speak
10   with residents concerning their property as it
11   relates to zoning.  If they would like to know
12   their setbacks for their property.  I speak to
13   applicants and developers as it relates to
14   applications, subdivisions, site plans, and any
15   new submittals, variances, conditional uses,
16   anything to that nature.  And I make sure to
17   present that information to the planning zoning
18   commission.
19              And also serve as the liaison between
20   the mayor and board of aldermen in presenting that
21   information in allowing the -- coordinating the
22   applicants on the dates to attend those meetings.
23        Q.   A lot of different hats that you wear.
24   As I understand, I believe you answered this,
25   through that role and through the community
```

Kianca Guyton 11/3/2025

```
1    development department, you would oversee the
2    enforcement and the application of the zoning
3    ordinances of the City of Madison?
4         A.   Yes.
5         Q.   And then I believe you said this, but
6    the rental department falls under you as well?
7         A.   Yes.
8         Q.   And does that include -- just so I'm
9    clear, anything that would fall under, I think
10   it's the Rental Inspection and Property Licensing
11   Act?
12        A.   Yes.
13        Q.   Do you know who Faith Funchess is?
14        A.   Yes.
15        Q.   Is Ms. Funchess a current employee of
16   the City of Madison?
17        A.   No.
18        Q.   Is she a prior employee of the City of
19   Madison?
20        A.   Yes.
21        Q.   What was Ms. Funchess' role when she was
22   employed with the City of Madison?  Or let me ask
23   that, because that could be a number of roles.
24             The time period that we're talking
25   about, June 2023, going forward, what would
```

Kianca Guyton 11/3/2025

1    Ms. Funchess' role with the City of Madison have
2    been during that time period?
3         A.   She was the rental compliance officer.
4         Q.   And based on your testimony a few
5    minutes ago, that would have fallen under the
6    community development department?
7         A.   Yes.
8         Q.   What are -- and you can give me less
9    detail than you gave me for your role.  What are
10   the very big line duties of the rental compliance
11   officer?
12        A.   So the rental compliance officer would
13   receive the applications for rental properties.
14   They would assist in scheduling with the applicant
15   the inspection.  They would take the application
16   fee and ensure that all of the application
17   components were included in the application.  So
18   that would be the bond, the fee, the letter from
19   the HOA, scheduling inspection.  And if all of
20   those -- if everything was completed, they would
21   issue the certificate of compliance.
22             The rental compliance officer also
23   ensures that persons are staying active with their
24   certificate of compliance, which means they have
25   to get one every year, and if they do not, they

Kianca Guyton 11/3/2025

```
 1   would issue out a notice to remind them.
 2        Q.    Okay.  I'm going to mark this as
 3   Exhibit 4.
 4             (Exhibit 4 marked for identification.)
 5        Q.    (By Ms. Stringer)  Ms. Guyton, I'm
 6   handing you what I've marked as Exhibit 4.  This
 7   is a June 1, 2023 letter signed by yourself, I
 8   believe.
 9             Ms. Guyton, have you seen -- this has
10   been marked as Exhibit 4.  It's got an
11   identification on the bottom Baptist 22.  I
12   believe it was part of Baptist Homes' document
13   production.  Have you seen this letter before?
14        A.    Yes.
15        Q.    And this is a letter that you sent as
16   the director of community development to Baptist
17   Homes, attention William McCormick; is that
18   correct?
19        A.    Yes.
20        Q.    Fair to say that at least as of
21   June 1st, 2023, as the community development
22   director, you were aware of Baptist Homes having
23   purchased the residence at 405 Drayton Place?
24        A.    Yes.
25        Q.    And this gets into some of the testimony
```

Kianca Guyton 11/3/2025

1    Mr. Layton gave.  But as I understand, Mr. Layton
2    is who brought the purchase to your attention?
3         A.   Yes.
4         Q.   I will not walk you back through
5    everything that Chief Layton has testified to that
6    the fire department, himself or someone under him
7    did in reviewing the purchase of 405 Drayton Place
8    by Baptist Homes.
9              Separate from what the fire department
10   did and may have reported to you, did you
11   undertake any independent investigation or review
12   of that purchase prior to submitting this
13   June 1st, 2023 letter?
14        A.   Yes.
15        Q.   Tell me what you did to review the
16   purchase of 405 Drayton Place by Baptist Homes.
17        A.   So the fire chief told me Baptist Homes
18   and potentially also the -- the name was Son
19   Valley.  So we did Google that.  I did Google that
20   name, Son Valley, to see what this organization,
21   Baptist Homes, is.  Because -- to see how they
22   would, is my understanding, be using the home.  So
23   I mean, it's my understanding from what was told
24   to the fire chief.
25              So it's my job as the zoning director to

Kianca Guyton 11/3/2025

1  see what land use is and to determine what zoning

2  classification is, to see if it's consistent with

3  the zoning ordinance is.  So when I Googled the

4  Son Valley, I looked to see what the organization

5  was.

6       Q.   And I don't think this is a question.

7  The property at 405 Drayton Place, and you can

8  refer to your letter if you need to, it is zoned

9  R1?

10      A.   Yes.

11      Q.   When you Googled Son Valley or Baptist

12  Homes, you said to look to see what type of

13  organization they were.  What were you able to

14  determine from that review?

15      A.   That it is -- that Son Valley, I don't

16  know how Baptist Homes, what their organizational

17  structure -- that Son Valley is an organization

18  that has a facility in Canton that has a daycare,

19  has activities for persons who are labeled as

20  intellectually disabled or require additional

21  services.

22           So Baptist Homes, being a parent company

23  or subsidiary of that, I searched for Son Valley

24  and that's what I saw on the Son Valley website.

25      Q.   Okay.  So that I make sure that we cover

Kianca Guyton 11/3/2025

1   everything.  I know you spoke to Chief Layton.

2       A.    Yes.

3       Q.    And then you said you performed -- you

4   did some Google search or internet search as to

5   what Son Valley Baptist organization, what that

6   organization does.

7            Any further review or investigation that

8   you conducted prior to sending this June 1st, 2023

9   letter to Baptist Homes, or does that encompass

10  it?

11      A.    Yes, that encompasses it.

12      Q.    Thank you.

13           In your letter of June 1st, 2023 to

14  Mr. McCormick, you state, "It was brought to our

15  attention that this residence was purchased to be

16  used as a multi-family, a medical facility or a

17  boarding house."  Is that correct?

18      A.    Yes.

19      Q.    When you refer to "brought to our

20  attention," are we referring back to Mr. Layton's

21  testimony that he had been contacted by somebody

22  with Son Valley?

23      A.    Yes.  Chief Layton came to me that it

24  had been brought to his office that -- he was

25  contacted by Mr. Minor or someone in his office

Kianca Guyton 11/3/2025

```
1    had been contacted about the home and needing a
2    fire inspection.
3         Q.   And that's what this is referring to
4    when it says "it was brought to our attention"?
5         A.   Yes, Chief Layton.
6         Q.   In this letter, you classified the use,
7    as you understood it, to be multi-family, a
8    medical facility or a boarding house.
9              MR. SIMPKINS:  Object to the form.
10             Answer if you can.
11             THE WITNESS:  Will you restate?  I'm
12   sorry.
13        Q.   (By Ms. Stringer)  Sure.  As identified
14   in your letter, you identified that the property
15   was to be used as multi-family, a medical facility
16   or a boarding house.
17        A.   Yes.
18        Q.   If you read down, it states,
19   "Multi-family or commercial uses are not an
20   allowable use in this zoning district."
21             Your reference to commercial uses, is
22   that the medical facility and the boarding house
23   would be considered a commercial use?
24        A.   Medical facility is considered a
25   commercial use.  A group home facility could be.
```

Kianca Guyton 11/3/2025

1    And so I stated multi-family or commercial use is
2    not an allowable use in this district.
3         Q.    You referenced group home just a second
4    ago.  The letter does not reference group home.
5    Are group home and boarding house, are you using
6    those interchangeably?
7         A.    Yes.
8         Q.    You included three different potential
9    uses in your June 1st, 2023 letter.  Were you
10   unable to confirm at that point in time which of
11   these uses, with certainty, Baptist Homes would
12   fall under?
13        A.    Yes, that's correct.  So just from the
14   information that was given to me from Chief
15   Derrick and from the website search, the use that
16   could potentially be used as, from my
17   understanding, was multi-family, a group home or
18   boarding home, or medical facility.  So that was
19   my determination.
20        Q.    I think this may make it a little
21   clearer as we go along.  This lawsuit has been
22   going on, I believe, since February 2024.  I will
23   tell you when I'm asking you questions, you may
24   have more information now since we've been in
25   litigation for a year-and-a-half.  But I'm going

Kianca Guyton 11/3/2025

```
 1    to try to limit myself -- I'm just trying to find
 2    out what you knew at that time.  Does that make
 3    sense?
 4             In fairness, if you found something out
 5    in the course of this litigation, that's not what
 6    I'm trying to learn.  So if you need me to clarify
 7    at any point in time when I'm talking about what
 8    information you had, just ask me.  But generally,
 9    I'm going to be talking about prior to the filing
10    of this lawsuit.
11         A.   Okay.
12         Q.   Other than yourself, did you consult --
13    you didn't consult with yourself.  But did you
14    consult with anyone before reaching the
15    conclusions that the purchase or use of
16    405 Drayton Place by Baptist Homes would be a
17    multi-family, a medical facility or a boarding
18    house?
19         A.   So counsel.
20         Q.   Legal counsel?
21         A.   Yes, was present.
22         Q.   I'm not going to ask you about any
23    conversations you had with legal counsel
24    specifically.  But when you refer to legal
25    counsel, are you referring to the City attorney
```

Kianca Guyton 11/3/2025

```
 1   for the City of Madison?
 2       A.   Yes.
 3       Q.   And that would have been prior to
 4   June 1st, 2023, when you reached the conclusions
 5   in this letter of multi-family, medical facility
 6   or boarding house?
 7       A.   Yes.
 8       Q.   Other than legal counsel, did you
 9   consult with anyone else?
10       A.   No.  I'm sorry, let me go back.  Based
11   on the phrasing of the question.  I spoke with
12   Chief Derrick.  Were you meaning -- what do you
13   mean by --
14       Q.   Sure.  I'll rephrase the question.
15   That's fair.
16            When I mean did you consult with anyone,
17   I am talking about specifically as to where this
18   potential use would fall under the zoning
19   ordinances?
20       A.   No.
21       Q.   I understand you spoke with Chief Layton
22   about his knowledge of the use of the property,
23   correct?
24       A.   Yes.
25       Q.   Did you discuss with Chief Layton how --
```

Kianca Guyton 11/3/2025

```
 1    if this would be classified as multi-family?
 2         A.   No.
 3         Q.   Did you discuss with Chief Layton if it
 4    would be classified as a medical facility under
 5    the zoning ordinances?
 6         A.   No.
 7              MR. SIMPKINS:  Make sure you let her
 8    finish the question.
 9              THE WITNESS:  I apologize.
10         Q.   (By Ms. Stringer)  No, you're fine.
11              Same question.  You didn't discuss with
12    Chief Layton under the zoning ordinances whether
13    this would be considered a boarding house?
14         A.   No.
15         Q.   Your letter invites Baptist Homes to
16    contact you to further discuss this matter,
17    referring to your communication to Baptist Homes.
18              Did you have any further communications
19    with Baptist Homes after the June 1st, 2023 notice
20    that you provided?
21         A.   Yes.
22         Q.   Who did you speak to at Baptist Homes,
23    if you recall?
24         A.   Ron Morton.
25         Q.   Were those communications by telephone?
```

Kianca Guyton 11/3/2025

```
 1        A.   Yes.
 2        Q.   Did you have any in-person meetings with
 3   Mr. Morton?
 4        A.   No.
 5        Q.   Do you recall when you first spoke with
 6   Ron Morton by telephone?
 7        A.   He called about a week after the letter
 8   went out, which was June 1st.  So he called about
 9   a week or two after that.
10        Q.   So sometime in June 2023?
11        A.   Yes.
12        Q.   And to your memory, what was the
13   substance of your conversation with Mr. Morton on
14   your first conversation you had with him in
15   June 2023?
16        A.   He called stating that they had received
17   the letter, Baptist Homes had received the letter,
18   and they wanted to clarify what their use -- what
19   the land use and how they would be utilizing the
20   home.
21             So he stated there would be four to five
22   persons.  That would include a staff member.  He
23   stated that Son Valley is an organization that
24   houses intellectually disabled persons.  There
25   would be a staff person on site at all times to
```

Kianca Guyton 11/3/2025

```
 1    assist or support the residents as they needed
 2    that assistance or support.
 3              I stated that from our conversation,
 4    this sounds like a boarding house.  And he thanked
 5    me for the call.  We ended the call.
 6         Q.   Did you ask Mr. Morton to provide you
 7    any type of additional information during that
 8    call beyond what he -- what you just identified
 9    for me you spoke about?
10         A.   No.
11         Q.   Following that call, if I understand
12    your testimony just now, you were -- you believed
13    this sounded like a boarding house?
14         A.   Yes.
15         Q.   As opposed to a medical facility?
16         A.   Yes.
17         Q.   Did you provide any further written
18    communication to Baptist Homes that you had
19    determined this would be a boarding house after
20    your June 1st, 2023, letter where you had stated
21    it may be multi-family, may be a medical facility
22    or may be a boarding house?
23         A.   I did not provide any additional written
24    communication, no.
25         Q.   After the first conversation you had
```

Kianca Guyton 11/3/2025

```
 1   with Mr. Morton that you just described, did you
 2   have any additional telephone conversations with
 3   Mr. Morton?
 4        A.   Yes.  He followed up a few months later,
 5   December, stating -- let me think.  I'm sorry,
 6   it's been a couple of years.  I'm a little
 7   nervous.
 8        Q.   Sure.  Take your time.
 9        A.   So from our -- from our June 1st
10   conversation, we got clarification on that it was
11   a group home.  June 1st, he was giving a
12   follow-up -- and I did state to him on the
13   June 1st call that -- I'm sorry, let me think.
14   I'm sorry, I'm nervous.
15        Q.   You're fine.  And let me make sure that
16   I don't cause you to misstate your testimony.  The
17   letter went out June 1st, 2023.
18        A.   Yes.
19        Q.   So when you're saying June 1st call,
20   you're referring to the call right after it?
21        A.   Yes.
22        Q.   Let's see if we can work through this.
23             You had a call with Mr. Morton sometime
24   in June 2023 after he received your letter of
25   June 1.
```

Kianca Guyton 11/3/2025

```
 1          A.    Yes.

 2          Q.    I believe you said you thought your next

 3    call was in December 2023; is that correct?

 4          A.    Yes.

 5          Q.    Did the City of Madison, in between

 6    those two time periods, did you undertake any

 7    additional investigation or review of the use of

 8    the property at Drayton Place?

 9          A.    So I did follow up -- I did send to

10    legal counsel stating that -- I did tell

11    Mr. Morton -- I think I called.  He may have been

12    unsure as to my interpretation.  I feel like I did

13    make a determination in that letter, and from our

14    conversation, I still stood on the fact that it's

15    a group home/boarding house.

16                I did tell him I would speak with legal

17    counsel.  I think he still felt that my

18    determination may not have been accurate.  But it

19    was a determination.  In that time, I did refer to

20    legal counsel.  Mr. Morton did have the option of

21    appealing my decision.  He did not do that.

22          Q.    Okay.  And we're going to talk about

23    that in a little while.

24                So after you spoke with Mr. Morton in

25    June 2023, at that time, you said you had
```

Kianca Guyton 11/3/2025

```
 1   concluded that this would be a boarding house?
 2        A.   Yes.
 3        Q.   And you -- at some point, you told
 4   Mr. Morton that you would speak with legal
 5   counsel?
 6        A.   Yes.
 7        Q.   And I don't want to know if -- any of
 8   the communications you had with legal counsel.
 9   Did you take this matter to the attention of legal
10   counsel following your conversation with
11   Mr. Morton in June 2023?
12        A.   I did let her know we had spoken.
13   Mr. Morton and I, I'm sorry, to clarify.  That I
14   had spoken with Mr. Morton.
15        Q.   And then as I understand you said
16   earlier, you did have a follow-up conversation
17   with Mr. Morton in December 2023?
18        A.   Yes.
19        Q.   Did Mr. Morton contact you?
20        A.   Yes.
21        Q.   Tell me what you recall about the
22   substance of that telephone conference with
23   Mr. Morton.
24        A.   So he was following up, was his words,
25   stating that do I feel it would be helpful if
```

Kianca Guyton 11/3/2025

```
 1   there was a meeting with the City attorney.  I let

 2   him know that he -- I believe he stated can he

 3   call her, and I stated, yes, you can.  You, of

 4   course, can call the City attorney.  And would it

 5   be helpful to have a meeting.  And I stated that

 6   he most certainly could meet with her.  That's

 7   something he could call and schedule that meeting

 8   with her, but I would pass the information along

 9   to her.

10       Q.   During either of the conversations that

11   you had by telephone with Ron Morton in June of

12   2023 or in December of 2023, did Mr. Morton

13   discuss with you Baptist Homes' intent to go

14   through the rental application process with the

15   City of Madison?

16       A.   No.

17       Q.   Not during those phone conversations?

18       A.   No.

19       Q.   You indicated that after your first

20   conversation with Mr. Morton in June of 2023, that

21   you concluded the use, as described, would be

22   considered a boarding house?

23       A.   Yes, a group home.

24       Q.   Did you document that decision anywhere?

25   You said you didn't send any communication to
```

Kianca Guyton 11/3/2025

1    Baptist Homes.  Did you document that anywhere in
2    your own files or the City of Madison's records?
3               MR. SIMPKINS:  Other than the June 1
4    letter?
5               MS. STRINGER:  Yes, following her
6    conversation with -- her June conversation with
7    Mr. Morton, I believe was the question.
8               THE WITNESS:  No.
9         Q.   (By Ms. Stringer)  This is not a memory
10   test, and so I will mark this -- I believe this is
11   going to be Exhibit 5.
12              (Exhibit 5 marked for identification.)
13        Q.   (By Ms. Stringer)  I will tell you, this
14   is section 3.02 of the zoning ordinances.  I do
15   not expect you to have memorized every definition.
16   So in fairness to you, let me hand you that.  And
17   this should be the entirety of section 3.02.
18              Ms. Guyton, if you'll turn to page 6.
19   There is a definition of boarding house on page 6.
20   Do you see that definition?
21        A.   Yes.
22        Q.   In your letter to Mr.  -- it's to
23   Mr. McCormick.  But in your letter to Baptist
24   Homes of June 1st, 2023, this definition of
25   boarding house in the zoning ordinances, is that

Kianca Guyton 11/3/2025

```
 1    what you're referring to when you say boarding
 2    house in your letter?
 3         A.   Yes.
 4         Q.   If you'll turn to page 9.  There is a
 5    definition on the bottom of the page, dwelling,
 6    multiple family.
 7              Would that be -- that definition of
 8    dwelling, multiple family in the zoning
 9    ordinances, would that be what you're referring to
10    in your June 1, 2023 letter when you say
11    multi-family?
12         A.   Yes.
13         Q.   I could not -- in these definitions, I
14    did not see a specific definition for medical
15    facility.  I think I saw a definition for
16    hospital, for clinic, for nursing facility.  And
17    so maybe you can help me.  When you're referring
18    to medical facility, are you referring -- what
19    definition of the zoning ordinances are you
20    referring to?
21         A.   So there is not a definition for the
22    term "medical facility."  When I stated -- using
23    the word "medical facility," I was stating the
24    range of uses -- range of medical uses or medicine
25    distribution that could be -- that could happen
```

Kianca Guyton 11/3/2025

1    there.

2              So I am not familiar with all of the

3    services that they provide at their facility.  So

4    that's why I stated that, that there may be a

5    range of services that could be provided to the

6    residents of the home.

7        Q.   Okay.  And as I understand, under the

8    zoning ordinance definitions, there are various

9    types of medical facilities that are defined.  So

10   you weren't referring to a specific definition I

11   need to look at in the zoning ordinances, as I

12   understand your testimony?

13       A.   Correct.

14       Q.   Can you explain to me, and please refer

15   to it as you need to, the definition of boarding

16   house on page 6.  Will you identify to me, based

17   on the facts that you had in June of 2023, what

18   was the factual basis for your concluding as the

19   community development director that the use by

20   Baptist Homes would be a boarding house?

21       A.   So as I understood it, there would be

22   five to six persons that would reside in the home,

23   at least four with a support staff that would be

24   there -- a support staff that would be there

25   24 hours, presumably residing in the home.  So

Kianca Guyton 11/3/2025

```
 1    somewhere between five persons to six persons.
 2              A boarding house, by definition, is a
 3    building for compensation, and by prearrangement,
 4    for definite periods, meals and/or lodging are
 5    provided for three or more persons.
 6              It's my understanding that by
 7    compensation, that over three persons would be
 8    presiding in this home.  And so they would be
 9    provided lodging and/or meals on a weekly or
10    monthly basis.
11              That fits the definition of a boarding
12    house.
13       Q.   I want to make sure I heard you right.
14    As you understood the use of 405 Drayton Place in
15    June 2023, your understanding was that the support
16    staff would reside at the home?
17       A.   There would be a support staff person
18    there 24 hours.
19       Q.   Okay.  And did -- was your understanding
20    that that support services person, that they would
21    actually reside at the home or just that there
22    would be somebody there 24 hours a day?
23       A.   Prior to the letter, I didn't have that
24    information.  You're asking -- did you ask prior
25    to --
```

Kianca Guyton 11/3/2025

1      Q.   Well, let me -- yeah, let's clarify
2  that.  Prior to your letter, at the time you sent
3  your letter, did you have information concerning
4  whether the support staff person would reside at
5  the home or simply come in and out of the home?
6      A.   Prior to the letter, it's my
7  understanding that there would be five to six
8  persons, at least four persons and a support staff
9  member.  Prior to the letter.
10      Q.   After your conversation with Mr. Morton
11  in June of 2023, did your understanding change in
12  regard to the role of the staff support person?
13      A.   There would be a person that would be
14  there 24/7.  So I don't know if they would sleep
15  there.  If there was a person that was on staff
16  that would sleep there, but there would be a
17  support staff there at all times.  So if they take
18  shifts or not, that, I don't know.  But there
19  would be a support person there 24/7.
20      Q.   Understood.
21            (Exhibit 6 marked for identification.)
22      Q.   (By Ms. Stringer)  Since we have the
23  zoning ordinances out, I'm going to hand you
24  Exhibit 6.  And this is all of section 28.01 of
25  the zoning ordinances.  But specifically, I

Kianca Guyton 11/3/2025

1    believe it includes the appeals procedures so you

2    can reference that as needed.  And that should be

3    the entirety of section 28 with all subsections

4    included, 28.01 through 28.15.

5            Ms. Guyton, you referenced earlier in

6    your testimony that there was an option for an

7    administrative appeal.  I don't know if that's the

8    exact words you used, but do you recall that

9    testimony earlier?

10       A.   Yes.

11       Q.   When you indicated that Baptist Homes

12   had the option to appeal, tell me -- why don't you

13   give me the factual basis for the City of

14   Madison's position that Baptist Homes had a

15   right -- well, could have made an administrative

16   appeal.  And I may need to back that up and break

17   that into a few parts.

18           Let me ask you this:  In the zoning

19   ordinances -- and let me turn you to -- so that

20   we're not just searching for it -- page 162,

21   section 28.14.

22           Does section 28.14 encompass the appeals

23   process under the City of Madison's zoning

24   ordinances?

25       A.   Allow me to read the whole thing.

Kianca Guyton 11/3/2025

```
 1        Q.    Absolutely.

 2        A.    (Examining.)

 3              Yes.

 4        Q.    You stated earlier that as the community

 5   development director, you concluded that Baptist

 6   Homes use of 405 Drayton Place would be as a

 7   boarding house.  After you spoke to Mr. Morton,

 8   received some more information following your

 9   June 1st, 2023 letter; is that correct?

10        A.    Yes.  It would be a group home/boarding

11   house.

12        Q.    And if you look at section 28.14, the

13   appeals section in the City of Madison's zoning

14   ordinances, it references an appeals from an

15   administrative interpretation of the zoning

16   administrator.  Do you see that?

17        A.    Yes.

18        Q.    Your determination that -- well, your

19   conclusion in the June 1st, 2023 letter that the

20   purchase was to be used as multi-family, medical

21   facility or boarding house, is that considered an

22   administrative interpretation of the zoning

23   administrator?

24        A.    Yes.

25        Q.    The City of Madison has asserted a
```

Kianca Guyton 11/3/2025

1    defense and has referenced in discovery -- I'm not
2    going to ask you to give me legal opinions.  But
3    there's been a defense asserted that Baptist Homes
4    did not pursue any right to administrative appeal
5    under the zoning ordinances.
6              Can you give me the factual basis for
7    the position that Baptist Homes failed to pursue
8    an administrative appeal?
9         A.   They -- on the June 1st letter, I did
10   state a position, a determination, and
11   interpretation.  And per the zoning ordinance,
12   they could use that to appeal.  So they could go
13   to the mayor and board of aldermen using that
14   determination, interpretation and state they'd
15   like to appeal that from my decision as the zoning
16   administrator.
17             Being a homeowner in the City of
18   Madison, they can go on the agenda.  They can call
19   and ask to be on the agenda for other issues.  So
20   they could have, most certainly, maxed out
21   their -- gone to the mayor and board and maxed out
22   that avenue.  They chose not to do so.
23        Q.   So according -- as I understand what
24   you're telling me, the letter of June 1st, 2023,
25   where you indicated this may be multi-family,

Kianca Guyton 11/3/2025

```
 1    medical facility or boarding house, that would be
 2    considered an administrative interpretation?
 3         A.    Yes.
 4         Q.    And at that time, it's the City of
 5    Madison's position Baptist Homes had the option to
 6    appeal this classification to the mayor or the
 7    board of aldermen under the zoning ordinances?
 8         A.    Yes.
 9         Q.    If you look back at section 28.14.  The
10    second paragraph says that, "All appeals shall be
11    in writing and shall include a copy of the
12    original application for a building permit, change
13    of use permit, dimensional variances, special
14    exception or rezoning, together with a statement
15    of the reason for the appeal."
16              Do you see that section?
17         A.    Yes.
18         Q.    Okay.  At the time of your June 1st,
19    2023 letter, had Baptist Homes submitted any
20    application for a building permit or a change of
21    use permit, a dimensional variance, special
22    exception or rezoning?
23              MR. SIMPKINS:  Let me object to the form
24    of the question.  Go ahead and answer if you can.
25              THE WITNESS:  I'm sorry, can you restate
```

Kianca Guyton 11/3/2025

```
 1   that?

 2       Q.   (By Ms. Stringer)  Sure.  My question

 3   is, as of June 1st, 2023, when you forwarded your

 4   letter to Baptist Homes, attention William

 5   McCormick, to your knowledge, had Baptist Homes

 6   submitted an application for a building permit?

 7       A.   No.

 8       Q.   As of June 1st, 2023, had Baptist Homes

 9   submitted a change of -- for a change of use

10   permit?

11       A.   No.  If I could -- go ahead.

12       Q.   Tell me what a change of use permit is,

13   if you know off the top of your head.  I'm not

14   trying to test you because I know the zoning

15   ordinances are a couple of hundred pages.

16       A.   So they -- they're changing a

17   single-family home into a boarding/group home,

18   commercial use, but they did not submit an

19   application.  So if your question is did they

20   submit an application, it did get to the fire

21   department that a commercial fire inspection

22   needed to be done, but there was no application

23   submitted.  So we don't have a -- so there's not

24   an official application that would state we would

25   like to operate as commercial use or a group home.
```

Kianca Guyton 11/3/2025

```
 1              So the answer, my hesitation is, why I
 2   answer no.  But they were changing the
 3   single-family use to a commercial/group home use.
 4   So that is a change, but there was no application
 5   submitted.
 6         Q.   And tell me, generally, and not talking
 7   specific about Baptist Homes.  If someone wants to
 8   change the use of a property or zoning, is there
 9   an application that you submit a change of use
10   application?
11         A.   We do not have an application for a
12   change of use.  They can -- if they are changing
13   the use and they come to us and it does not
14   require a rezoning, then there's not an
15   application that says change of use.  That's a
16   discussion that they could have, and we make sure
17   that fits -- the new use fits in the zoning
18   ordinance.
19         Q.   Okay.  I'm going to make sure I
20   understand you.  There's not a written document
21   that's an application for change of use permit?
22         A.   Correct.
23         Q.   And so if someone wanted to change the
24   use of a building or a property, they would come
25   to, is it to the community development department
```

Kianca Guyton 11/3/2025

1    to discuss that?

2        A.    Yes.

3        Q.    If someone comes to the community

4    development department and asking for a change of

5    use permit, are they granted any type of written

6    confirmation of that or written denial of the

7    change of use?  You said it was a verbal

8    discussion.

9        A.    So, for instance, if someone used to

10   have a dental clinic and now they wanted to

11   operate a law firm, they could -- they would call

12   and say, I'm just checking to make sure this use

13   fits in this zoning district.  So they're somewhat

14   changing.  Or they wanted to operate -- a gym was

15   there, can I now operate a law firm, does this fit

16   the zoning for this district?  So they're changing

17   the use, but they want to make sure this fits.

18   They would follow up with asking for a zoning

19   confirmation letter or a zoning verification

20   letter, if those chose to do that.  Many people

21   just say, well, thank you.  They can proceed

22   forward with buying the property.

23           People typically call before purchase to

24   ensure that the zoning fits, that the use of their

25   wanting to put their fits the zoning ordinance.

Kianca Guyton 11/3/2025

1        Q.    Okay.  And so what you described is this

2   change of use permit process that's referenced in

3   the appeals statement here?

4        A.    Uh-huh.  (Affirmative response.)

5        Q.    Okay.

6              MR. SIMPKINS:  Be sure to say "yes" or

7   "no."

8              THE WITNESS:  Yes.

9        Q.    (By Ms. Stringer)  Is there a specific

10  application for dimensional variance?

11       A.    Yes.

12       Q.    And special exception or rezoning.  I

13  believe I understand those from reviewing the

14  zoning ordinances, but is there a special

15  application if you want a special exception or a

16  rezoning?

17       A.    Yes.

18       Q.    And so the administrative appeal process

19  which you've referenced could have begun after

20  receipt of your June 1, 2023 communication.

21              Would that be an appeal of specifically

22  the classification of the City of Madison, that

23  this use is a multi-family use, for example?

24       A.    So the determination was that this is a

25  group home/boarding house, commercial facility, so

Kianca Guyton 11/3/2025

```
 1    they could have appealed based on the
 2    determination, the interpretation that was given,
 3    and they could have brought that letter and stated
 4    this is a determination and we'd like to appeal
 5    the administrative interpretation of the zoning
 6    administrator.
 7          Q.    That the use would be a boarding house?
 8          A.    The zoning classification.
 9          Q.    Yes, I think we are --
10          A.    Yes.
11          Q.    Do you need a break?  Are you okay?
12          A.    I'm okay.
13          Q.    Does the City of Madison have any
14    specific written procedures concerning the process
15    to request a reasonable accommodation under the
16    Fair Housing Act or the Americans with
17    Disabilities Act?
18          A.    No.
19          Q.    If a resident or an organization in the
20    City of Madison does seek to request a reasonable
21    accommodation under the Fair Housing Act or the
22    Americans with Disabilities Act or, really, from
23    zoning ordinances, does that -- does the community
24    development office have a role in that request for
25    reasonable accommodation?
```

Kianca Guyton 11/3/2025

```
 1              MR. SIMPKINS:  Object to the form of the
 2    question.
 3         Q.   (By Ms. Stringer)  And if you
 4    understood, you can answer.  I'm happy to rephrase
 5    it if you didn't.
 6         A.   Will you restate it?
 7         Q.   Sure.  The community development office,
 8    does that office have a role in, I'll say,
 9    processing a request for reasonable accommodation
10    under the Fair Housing Act or the Americans with
11    Disabilities Act?
12              MR. SIMPKINS:  Object to the form of the
13    question.  Assumes this has occurred in the past.
14    But answer it if you can.
15              THE WITNESS:  So the applicant would
16    make -- the mayor and board of aldermen would
17    determine or make a decision, make an approval for
18    what would be considered reasonable and if that
19    reasonable accommodation for that particular
20    case-by-case basis.  So that would be a request
21    that they could make to the mayor and board of
22    aldermen who would make that decision.
23         Q.   (By Ms. Stringer)  Okay.  And would that
24    have been the process for someone to make a
25    request for reasonable accommodation under the
```

Kianca Guyton 11/3/2025

```
 1    Fair Housing Act or the Americans with
 2    Disabilities Act in June 2023, is the process the
 3    same then?
 4         A.    Can you restate the question?
 5         Q.    Sure.  You just described to me that the
 6    process for one to request a reasonable
 7    accommodation under the Fair Housing Act or
 8    Americans with Disabilities Act would be to go
 9    through the mayor and board of aldermen.  Would
10    that have been the process in the June 2023 time
11    period?
12         A.    Yes.
13         Q.    And so based on that, a request for a
14    reasonable accommodation to the FHA or ADA, that
15    would not go through the community development
16    office?
17         A.    Are you asking -- I'm sorry, are you
18    asking if that's the path Mr. Morton --
19         Q.    No.  I'm asking -- not specific to this
20    particular situation.  My question is, if an
21    organization or if an individual sought to make a
22    request for reasonable accommodation under the
23    Fair Housing Act or the ADA, you just told me that
24    would go through the mayor and the board of
25    aldermen.  My question is, does the office of
```

Kianca Guyton 11/3/2025

1    community development -- or community development
2    office, I think is the official title, does the
3    community development office have any role in the
4    City's handling of that request for reasonable
5    accommodation?
6         A.   The entity would make that request to
7    appear on the mayor and board of aldermen to ask
8    for an accommodation.  That was not a request they
9    made.
10        Q.   So you would need to, as I understand
11   what you're telling me, the requester would need
12   to make a request to take their request for
13   reasonable accommodation to the mayor and board of
14   aldermen?
15        A.   So they could request to get on the
16   mayor and board of aldermen agenda at that time
17   for -- they can state what the reason is, why they
18   want to go on the agenda because they are asking
19   for a reasonable accommodation and they can state
20   what their zoning classification, what the land
21   use is and why they're asking for that
22   accommodation or variation from the zoning
23   ordinance, and the mayor and board of aldermen
24   would grant or make the decision to provide any
25   accommodations.

Kianca Guyton 11/3/2025

```
 1          Q.   And who do you -- who does someone ask
 2    to be put on the agenda for the mayor and the
 3    board of aldermen?
 4          A.   So they could -- they would ask -- they
 5    could call the City, ask that question, and the
 6    City clerk handles the mayor and board of aldermen
 7    agenda.  They could most certainly -- oftentimes,
 8    people call and ask for the mayor's office and
 9    then ask who do I need to talk to.
10          But once you call -- our general number
11    for Madison City Hall and ask how do I get on the
12    agenda, they'll direct you to the City clerk's
13    office who handles the mayor and board of aldermen
14    agenda.
15          (Exhibit 7 marked for identification.)
16          Q.   (By Ms. Stringer)  I'll mark this as
17    Exhibit 7.
18          Ms. Guyton, this is a December 14th,
19    2023 letter addressed to yourself from Ron Morton
20    in his role as president of Son Valley, a ministry
21    of Baptist Homes.
22          Have you seen this letter before,
23    Ms. Guyton?
24          A.   Yes.
25          Q.   And if you need to take time to review
```

Kianca Guyton 11/3/2025

1    it, I'm happy to give you time to do that.

2         A.    I'd like to read it again.

3         Q.    Sure.  Why don't we go off the record

4    for a second and we'll give you time to read it.

5              MR. SIMPKINS:  Yeah, we'll just take a

6    short break, a five-minute break.

7              (Off the record.)

8         Q.    (By Ms. Stringer)  Ms. Guyton, did you

9    just have an opportunity to review the

10   December 14th, 2023 letter from Ronald Morton to

11   yourself?

12        A.    Yes.

13        Q.    Did you actually receive a copy of this

14   letter by Mr. Morton?

15        A.    Yes.

16        Q.    We spoke a little while ago about a

17   telephone call you remembered having with

18   Mr. Morton in December of 2023.  Do you know if

19   that telephone call was before you received this

20   letter or after you received this letter?

21        A.    Before.

22        Q.    And if you look at the letter, the first

23   paragraph does state "it follows your letter of

24   June 1 and our two subsequent phone calls"?

25        A.    Yes.

Kianca Guyton 11/3/2025

1     Q.   Those two subsequent phone calls, I
2   believe we talked about a phone call you had with
3   Mr. Morton in June 2023 and then the one in
4   December 2023?
5     A.   The second one, I don't know the exact
6   date, but before this letter.  So roughly about
7   that time period.
8     Q.   This communication from Mr. Morton, at
9   the bottom of the first page, it indicates
10   Mr. Morton's understanding.  He says that, "My
11   understanding at the conclusion of our call" --
12          MR. SIMPKINS:  Where are you reading?
13          MS. STRINGER:  Oh, I'm sorry.  The
14   last -- third line up on the last paragraph of the
15   first page.
16     Q.   (By Ms. Stringer)  Mr. Morton's
17   conclusion -- when I say "my," Mr. Morton's
18   "understanding at the conclusion of our call."
19   I'm not going to reread the whole thing.  But it's
20   talking about arranging a potential meeting with
21   the City attorney or other City officials.
22          You spoke a little while ago about your
23   recollection of the call with Mr. Morton, and so I
24   want to make sure I understand.  I believe you
25   told me your recollection of the call was that

Kianca Guyton 11/3/2025

```
 1    Mr. Morton was going to schedule whatever meetings
 2    he felt was necessary?
 3         A.   So I do not recall stating that I would
 4    schedule any meetings, definitely not with any
 5    City officials.  I don't know where Mr. Morton
 6    gets that from.  He asks, Do you think it would be
 7    helpful to schedule a meeting with the City
 8    attorney?  He did state could he call her
 9    directly.  I told him absolutely, he could call
10    her directly.  I would pass on any information,
11    but he could call her and schedule appointments.
12    But I would pass on information that he would like
13    to schedule any appointment.  I didn't make any
14    provisions of any City officials.
15         Q.   So your recollection of that phone call
16    with Mr. Morton, you did not leave that phone call
17    with the intent that you were going to schedule
18    any meetings for Mr. Morton with the City attorney
19    or any other City officials?
20         A.   Yes.
21         Q.   "Yes," that's your understanding, you
22    were not intending to do that, correct?
23         A.   I stated to him that he could call the
24    City attorney.  I would pass on the information
25    that he would like to have a meeting with her.  He
```

Kianca Guyton 11/3/2025

1    asked would it be helpful.  He asked you think it
2    would be helpful to schedule a meeting.  I said
3    yes, you absolutely can schedule the meeting with
4    her, and I would pass on the information that you
5    wanted to have a meeting with her.
6         Q.   You were not taking the responsibility
7    for setting that meeting personally?
8         A.   That's correct.  I was not taking the
9    responsibility to set the meeting.
10        Q.   After you received this letter, did you
11   provide a copy of this letter to anyone else with
12   the City of Madison?  And I'm talking about pre
13   the lawsuit being filed in February.  So just at
14   the time you received this letter, did you provide
15   a copy of it to anyone else with the City of
16   Madison?
17        A.   I believe I forwarded it to legal
18   counsel.  He did not CC her on this letter.
19        Q.   Did you discuss this letter with --
20   other than legal counsel -- with anyone else in
21   the community development office?
22             MR. SIMPKINS:  Let me just instruct you.
23   If there was such a discussion and counsel was
24   present, I instruct you not to answer.  If it's a
25   conversation without counsel present, you're free

Kianca Guyton 11/3/2025

```
 1    to answer.
 2              THE WITNESS:  No, I did not.  Restate
 3    your question.
 4         Q.   (By Ms. Stringer)  Let me make sure
 5    we're on the same question.  Sure.
 6              I don't want the substance of any
 7    conversations you had with anyone if legal counsel
 8    was present.  And so my question at this time is
 9    simply did you have any discussion -- you said you
10    forwarded a copy of the letter to legal counsel.
11    Did you have a discussion with anyone else in the
12    community development office concerning
13    Mr. Morton's letter of December 14th, 2023?
14         A.   No.
15         Q.   Did you have a discussion with anyone
16    else with the City of Madison concerning
17    Mr. Morton's December 14th, 2023 letter?  Not the
18    substance, just did you have any other
19    conversations?
20         A.   No.
21         Q.   If you turn to -- it has a Bates number
22    on it of Madison 18.  The paragraph that begins,
23    "We are ready to move forward with leasing this
24    property."
25              Do you see that paragraph?
```

Kianca Guyton 11/3/2025

1        A.    Yes.

2        Q.    You testified earlier, and correct me if

3    I'm wrong, in your verbal conversations you had

4    with Mr. Morton you said y'all did not discuss the

5    intent with Baptist Homes to go through the

6    leasing process?

7        A.    I don't recall that we discussed him

8    filing an application for rental property.

9        Q.    If you look at the last two sentences --

10   well, let me -- I don't want to cut it off.  The

11   third sentence in that paragraph that begins "we

12   are ready."  States, "insofar as the City."

13           Do you see that sentence?  It's on the

14   third line.

15       A.    Yes.

16       Q.    Okay.  In that sentence, it states,

17   "Insofar as the City has concluded that the lease

18   of this premises" -- I'm not going to read the

19   entire thing.  But on the last line of that

20   sentence, Mr. Morton states, "Consider this letter

21   our formal request for a reasonable accommodation

22   of that inconsistency."

23           Do you see that language?

24       A.    Yes.

25       Q.    When you received this letter and that

Kianca Guyton 11/3/2025

```
 1    language regarding a reasonable accommodation, did
 2    you have any further communications with
 3    Mr. Morton concerning that request for a
 4    reasonable accommodation?
 5         A.   No.
 6         Q.   I know you testified just a minute ago
 7    that you provided at least legal counsel a copy of
 8    Mr. Morton's letter.
 9              In your role as the community
10    development director, did you provide any response
11    to Baptist Homes to this request for reasonable
12    accommodation of that inconsistency, referring to
13    the zoning ordinance?
14         A.   So let me clarify.  At that time -- now
15    I do understand what reasonable accommodation is.
16    But at that time, reasonable accommodation, I took
17    it to mean a variation from the zoning ordinance,
18    not reasonable accommodation to the ADA or FHA.
19         Q.   Okay.
20         A.    So in him stating a reasonable
21    accommodation, to me that meant he may be using
22    the word "variance," we can use the word
23    "conditional use," a variation of the zoning
24    ordinance.
25         Q.   Okay.  In December of 2023 -- not
```

Kianca Guyton 11/3/2025

1    speaking specifically to this letter -- as the
2    community development director, were you familiar
3    with certain requirements under the Fair Housing
4    Act that reasonable accommodations may have to be
5    made in certain circumstances?
6         A.   I was not specifically -- I didn't
7    understand the word "reasonable" -- I did not know
8    the word "reasonable accommodation," that that
9    meant -- now I've done research and I do
10   understand what that means.  But at that time, to
11   me, it triggered they're asking for a variation or
12   conditional use from the zoning ordinance.
13        Q.   Okay.  And just so I have a full record,
14   I think I asked that question specific to the Fair
15   Housing Act.  I'll ask it specific to the
16   Americans with Disabilities Act.  And I think the
17   language is a little different there.  But in
18   December of 2023, the word "reasonable
19   accommodation," did that have any specific meaning
20   to you under the ADA?
21        A.   The word "reasonable accommodation"
22   meant, to me, a variation as used in this context,
23   a variation from the zoning ordinance.  So I did
24   not understand that reasonable accommodation is
25   tied to the Fair Housing Act or the Americans with

Kianca Guyton 11/3/2025

1    Disabilities Act and what encompassed.  That's a
2    legal term.
3        Q.   It is certainly, I think, a statutory
4    term.
5             You talked about a variation.  As I
6    understand the zoning ordinance, is there are
7    processes for seeking a variance from the zoning
8    ordinance?
9        A.   So variances are -- and let me add that
10   this is our first time having this situation.  And
11   a variance is dimensional.  Many people use the
12   word "variance" when they mean a variation from
13   the zoning ordinance.  So a variance is
14   dimensional.  So height increase, setback
15   decrease, dimensionally.
16            A condition of use is also a variation
17   from required uses, but it's listed as a what we
18   also call a special exception.  So there's a list
19   under each zoning district of uses that can be
20   considered but are not outright allowable uses.
21       Q.   So when you reference "variation" a few
22   minutes ago, you're referring not to a variance,
23   you're referring to the special exception
24   conditional use?
25       A.   Correct.

Kianca Guyton 11/3/2025

```
1        Q.    Okay.  So as I understand your
2   testimony, when you read Mr. Morton's request for
3   a reasonable accommodation, that did not trigger
4   to you the FHA or the ADA?
5        A.    Correct.
6        Q.    And you did not take any follow-up with
7   Mr. Morton to clarify what he meant?
8        A.    That's correct.
9        Q.    I think it would be fair to say, then,
10  that as of December 14th, 2023, when you received
11  this letter, at least the community development
12  office did not take any action to either -- to
13  grant or deny that reasonable accommodation
14  request?
15       A.    The community development department
16  could not have done it.  That's a mayor and board
17  of aldermen action.
18       Q.    Did you present -- as the community
19  developer director, when you received this letter
20  from Mr. Morton, did you inform the mayor or the
21  board of aldermen that there was a request for
22  reasonable accommodation?
23       A.    That would have been a burden of the
24  applicant to request to be on the mayor and board
25  of aldermen agenda to speak to them regarding the
```

Kianca Guyton 11/3/2025

```
 1    request of a reasonable accommodation or as an
 2    appeal to the interpretation from the June 1st
 3    letter.
 4          Q.   And I believe you told me earlier that
 5    there is not any type of written procedure the
 6    City of Madison has concerning how to make a
 7    request for reasonable accommodation under the FHA
 8    or the ADA?
 9          A.   Correct.
10          Q.   And so how would an organization know
11    that the process was that they needed to ask to be
12    on the agenda of the board of aldermen?
13          A.   So they -- the Baptist Homes does have
14    legal counsel, and that could have been a question
15    they could have asked legal counsel, was the
16    process -- they could have asked what's the
17    process to get on the board agenda.
18          Q.   Is there anywhere that Baptist Homes
19    could have looked that would have told them you
20    need to request to get on the board agenda if you
21    want to make a request for reasonable
22    accommodation?
23               I'm not trying to be difficult.  I'm
24    just trying to figure out how they were supposed
25    to know what to do.
```

Kianca Guyton 11/3/2025

1                    MR. SIMPKINS:  Objection, asked and

2      answer.

3           Q.   (By Ms. Stringer)  What you've told me

4      is that you can make a request to get on the

5      agenda of the board of aldermen.

6           A.   Yes.

7           Q.   Is there -- the process for a variance,

8      for example, which is under the zoning ordinances;

9      is that right?

10          A.   Yes.

11          Q.   Is that process that you -- what you

12     know, I'm not going to go down that route because

13     I think it would take us a long time.

14               Okay.  Let me just summarize and make

15     sure I understand.  Baptist Homes' option to

16     request a reasonable accommodation under the FHA

17     or the ADA, they should have gone and made a

18     request to get on the agenda for the board of

19     aldermen?

20          A.   To make that request, yes.

21          Q.   To make that request.

22          A.   To grant that request.

23          Q.   And the way you get on the agenda for

24     the board of aldermen is to call the City clerk's

25     office and ask to be put on the agenda?

Kianca Guyton 11/3/2025

```
 1        A.    Yes.
 2        Q.    Okay.  I don't know if I've asked you
 3   this or not, but did you have any communications
 4   at all with Mr. Morton after December 14th, 2023
 5   when you received this letter?
 6        A.    No.
 7        Q.    Did you have any communications with any
 8   other representative of Baptist Homes after
 9   December 14th, 2023?
10        A.    No.
11              MR. SIMPKINS:  We've been going about an
12   hour and 15 minutes.
13              MS. STRINGER:  I'm happy to take a
14   break.
15              (Off the record.)
16        Q.    (By Ms. Stringer)  Ms. Guyton, we're
17   about to switch topics.  Let me ask you one
18   question.  You explained to me right before we
19   took a break the process of going to the board of
20   aldermen if someone wanted to obtain a reasonable
21   accommodation under the FHA or the ADA.  Is that
22   the current process for the City of Madison?
23        A.    So that would be the process.  Again, we
24   have not had this situation before.  So to say has
25   that always been the process, this is our first
```

Kianca Guyton 11/3/2025

```
 1   time.
 2        Q.    This is your first time to receive a
 3   request for reason accommodation?
 4        A.    Right.
 5              MR. SIMPKINS:  Under the ADA and FHA.
 6              THE WITNESS:  Under the ADA and FHA.
 7        Q.    (By Ms. Stringer)  Okay.  Let me ask it
 8   a different way then.  There has not been a change
 9   in the process between June 2023 and current day?
10        A.    No, and we have not had any request for
11   this.  Again, this is brand new.  But that would
12   be the process.
13        Q.    Okay.  And that's what I wanted to
14   clarify.  That would have been the process in
15   June 2023?
16        A.    Yes.
17        Q.    All right.
18              (Exhibit 8 marked for identification.)
19        Q.    (By Ms. Stringer)  Let me hand you
20   Exhibit 8.  I understand you are not copied on
21   this, but this is an e-mail from Ronald Morton to
22   Ms. Brannon.
23              And my only -- really, my main question
24   is did the City of Madison receive this
25   communication from Mr. Morton dated February 12th,
```

Kianca Guyton 11/3/2025

1    2024?

2              MR. SIMPKINS:  I can answer.  It was

3    received and kept in the ordinary of course of

4    business of Madison's records, if that's what

5    you're trying to do is authenticate it.

6              MS. STRINGER:  Yes.  I just wanted to

7    confirm there wasn't a question of whether or not

8    the e-mail was, in fact, received.

9              MR. SIMPKINS:  I'll note for the record,

10   it's Bates stamped Madison 37, and it was produced

11   by Madison from its records.  The date of the

12   e-mail is 2/12/24.

13        Q.   (By Ms. Stringer)  Ms. Guyton, I think I

14   know the answer to this, but prior to the

15   litigation in this matter, did you review this

16   e-mail dated February 12th, 2024 as the community

17   development director?

18        A.   I did not prior to -- and litigation was

19   filed the next day, and it was received at 5453.

20        Q.   Okay.  So you did not review this prior

21   to the litigation that was filed?

22        A.   No.

23        Q.   Let's change directions.  The City of

24   Madison has a -- make sure I get this right --

25   Rental Inspection Property Licensing Act?

Kianca Guyton 11/3/2025

```
 1        A.    Yes.

 2        Q.    Do you call that anything shortened?

 3        A.    RIPLA.

 4        Q.    RIPLA.  Okay.

 5              And I believe, as I understood your

 6    description of your job responsibilities,

 7    enforcement of RIPLA would fall under the

 8    community development office?

 9        A.    Yes.

10        Q.    And you described for me at the time

11    that Ms. Funchess was employed what her roles

12    were.  Would that same description cover what,

13    essentially, the community development office,

14    what their role is in enforcing RIPLA?

15        A.    So the rental office handles the rental

16    applications.  If there is a need to escalate that

17    to me, if someone has -- would like to speak to a

18    supervisor or a further interpretation, I would

19    handle that.

20        Q.    Is there any other department within the

21    City of Madison outside of the community

22    development department that handles the

23    application process or is involved in the

24    application process under RIPLA?

25        A.    Restate your question.
```

Kianca Guyton 11/3/2025

```
 1        Q.    Sure.  Other than the community
 2  development office, are there any other
 3  departments in the City of Madison that would be
 4  involved in processing the applications under
 5  RIPLA?
 6        A.    Currently or at the time?
 7        Q.    At the time.  In June 2023.
 8        A.    Yes, the legal department.  So
 9  applications were -- once they are received
10  through the rental compliance office, they were
11  forwarded to legal.  They reviewed the
12  applications and sent them back to the rental
13  compliance office.
14        Q.    So one would submit a rental application
15  through the community development office, it would
16  be reviewed, forwarded to legal counsel for
17  review, and then come back to the rental office?
18        A.    Correct.  They would be submitting to
19  the rental office, which does fall under community
20  development.  But they would be submitting to the
21  rental office.
22        Q.    What is the -- has that process changed?
23        A.    Yes.
24        Q.    What's the current process?
25        A.    So now the rental office accepts,
```

Kianca Guyton 11/3/2025

1    receives, processes the application.  If there are

2    legal questions, they would refer that to legal.

3    Otherwise they would -- or if there are other

4    questions that need to be addressed, if they ask

5    to speak to a supervisor or need additional

6    interpretation, then I would handle that, and the

7    rental compliance office would process all

8    applications.

9        Q.   So really, the only difference is in

10   2023, every application went through legal.  Now,

11   the current process, it would be sent to the legal

12   department only if there was a need for review?

13       A.   That's correct.

14       Q.   Will you tell me what, exactly, the

15   planning and zoning commission is?  That is not a

16   department under the community development office,

17   is it?

18       A.   That's correct.  That is not a

19   department.  The community and zoning commission

20   is an advisory board made of community residents

21   that are appointed by the mayor and board of

22   aldermen.  They serve in essentially a volunteer

23   capacity, and they review applications related to

24   the zoning ordinance.  So that would be site

25   plans, preliminary plats, variances.  And they

Kianca Guyton 11/3/2025

```
 1   make a recommendation to the mayor and board of
 2   aldermen, so they can recommend approval or they
 3   can deny the applications.
 4        Q.   The --
 5        A.   And --
 6        Q.   Go ahead.  I didn't mean to cut you off.
 7        A.   And they meet the second Monday of every
 8   month.
 9        Q.   Does the application process under
10   RIPLA, does that go through the planning and
11   zoning commission?
12        A.   No.
13        Q.   How does, generally, if -- you talked
14   about variances, for example.  Does someone submit
15   the variance directly to the planning and zoning
16   commission or do they submit that through the
17   community develop office first?
18        A.   They would submit that to me, the
19   community development office.  We would process
20   that application, and we would -- after we package
21   up the packets, we'd give it to the police
22   department and they deliver it to the homes of
23   planning and zoning commissioners.  But it goes
24   through the community development office.
25             (Exhibit 9 marked for identification.)
```

Kianca Guyton 11/3/2025

```
 1        Q.   (By Ms. Stringer)  This will be
 2    Exhibit 9.
 3              Ms. Guyton, this is part of Madison's
 4    production.  It's Madison 23 to 24, is the Bates
 5    number, a Rental Inspection and Property License
 6    Application.
 7              MR. SIMPKINS:  This is Exhibit 9?
 8              MS. STRINGER:  Exhibit 9, yes.
 9              MR. SIMPKINS:  Let the record reflect
10    it's Madison Bates stamp 23 and 24.
11              MS. STRINGER:  I think I did, but I may
12    not have.
13              MR. SIMPKINS:  Sorry.
14        Q.   (By Ms. Stringer)  This appears to be,
15    as I look at it, an application under RIPLA
16    submitted by Baptist Homes.  Is that your
17    understanding of what that would be?
18        A.   Yes.
19        Q.   Is this the typical Rental Inspection
20    and Property Licensing Application, at least -- it
21    may have changed, but back in June 2023?
22        A.   It does have a front page, and it does
23    have a subsequent page regarding a bond, but this
24    is a portion of the application.
25        Q.   Okay.  Let me hand you this, too.  We'll
```

1    mark this -- this will be Exhibit 10.

2              (Exhibit 10 marked for identification.)

3         Q.   (By Ms. Stringer)  I believe I have the

4    full packet, but I wasn't going to ask you

5    questions about the entire packet.  Let me hand

6    you Exhibit 10, which is Application Checklist and

7    Fee Schedule.  Would that be the first page that

8    you were referring to?

9         A.   Yes.

10        Q.   If you look, this is Madison 36, the

11   Application Checklist and Fee Schedule.  Is this

12   completed -- you see checkmarks in the boxes

13   there.  Are those checkmarks completed by the

14   applicant or are those completed by someone in the

15   rental office?

16        A.   It can be done either way.  The

17   applicant -- in this instance -- we prefer the

18   applicant does it.  In this instance, it was done

19   by the applicant.  The applicants must come in to

20   submit the application.  At that time, the rental

21   compliance officer is standing there, and so they

22   will -- she will go through -- she or he, it's a

23   woman at this time -- will go through each of

24   these things to make sure that they have

25   everything.  So at that time, it would get checked

Kianca Guyton 11/3/2025

1    off or noted or make sure that all -- everything

2    is there, and then if there's something missing,

3    she would tell the applicant this is what's still

4    missing.  So they go through the checklist.

5    Whether if it's checked off or not, she still

6    makes sure they have everything there.

7        Q.   And so the fact that -- if you look at

8    this particular Application Checklist and Fee

9    Schedule, this would indicate at least that

10   Baptist Homes submitted everything it was required

11   to submit as part of its application under RIPLA?

12   And I mean documentary-wise when they appear to

13   submit the application.

14       A.   Right.  I don't have a copy of the

15   letter of the HOA and then the deed, but I believe

16   in discovery, those things were present.

17       Q.   Okay.  And I can get -- I don't think we

18   have to go through all of that, but generally,

19   that is what this would indicate, the rental

20   officer is going to go through the package, the

21   checklist and confirm you have everything?

22       A.   Yes.

23       Q.   This particular process and this

24   Application Checklist, that does not make a

25   determination whether or not the rental

Kianca Guyton 11/3/2025

```
 1   application would be ultimately approved?
 2        A.   Correct.
 3        Q.   Again, and I am only -- well, so this
 4   was submitted.  It looks like it's signed the 29th
 5   of January.  It doesn't have a year, does it?  It
 6   would have been 2024, based on the dates that
 7   we're looking at.
 8             But at that period of time, this
 9   application would have gone to the rental office
10   and then it also would have gone to the legal
11   department?
12        A.   Yes.
13        Q.   Did -- and again, I'm talking about
14   prior to the litigation that was filed in
15   February 2024.  As the community development
16   director, did you receive this particular -- you
17   said in some circumstances, questions might come
18   to you.
19             Do you know if this particular
20   application by Baptist Homes came to you in your
21   role as community development director?
22             MR. SIMPKINS:  Object to the form of the
23   question.  You can answer.
24             THE WITNESS:  It did not.
25        Q.   (By Ms. Stringer)  It did not.
```

Kianca Guyton 11/3/2025

```
 1              Were you aware in -- prior to -- as the
 2  community development director, were you
 3  personally aware prior to the filing of the
 4  lawsuit in this case that Baptist Homes had
 5  submitted an application under RIPLA?
 6      A.   Yes.  I was aware that they were -- I
 7  didn't see a copy of it, but I was aware they
 8  probably were going to -- it was mentioned to me
 9  at some point.  But I didn't see the full
10  application.
11      Q.   Okay.  Did you have any conversations
12  with Faith Funchess concerning Baptist Homes'
13  application under RIPLA?
14      A.   No.  And it may have been post
15  litigation.  The application and litigation
16  happened, so -- they were really close together.
17  So I can't say if I was aware.
18      Q.   Okay.  I definitely want your testimony
19  to be clear.  You're not sure --
20              MR. SIMPKINS:  Were you finished
21  answering?
22              THE WITNESS:  Yes, I'm finished.  I'm
23  sorry.
24      Q.   (By Ms. Stringer)  You're not sure if
25  you became of this particular application before
```

Kianca Guyton 11/3/2025

1  or after the lawsuit was filed.  It's been a
2  couple of years, you don't remember.  Is that what
3  you're telling me?
4      A.  Yes.
5      Q.  And I don't want to make you remember
6  things that you don't.  I understand that.  Thank
7  you for clarifying that.
8          Generally, and I'm going back to -- I
9  understand the process has changed, so let's talk
10 about the January 2024 time period.  Did -- how
11 long, typically, under that process, once someone
12 submitted a rental application -- I'm not talking
13 about Baptist Homes -- but was there a general
14 time period that it would take for an application
15 to go through the review process?
16     A.  I don't have an exact time.  The
17 application -- she would not send the application
18 to legal until she had received everything.  So
19 that would be the bond, application fee, all the
20 things on the checklist.  Then she would send it
21 to legal, however long it takes to get through
22 legal.  Once it got through legal, if there were
23 no problems or anything that would indicate
24 additional information would need to be requested,
25 then they would schedule an inspection and that

Kianca Guyton 11/3/2025

```
 1    could take -- they could have booked it that week
 2    or the next week if that week had already been
 3    booked up.
 4              They would need to pass that inspection.
 5    If they failed that inspection, then a
 6    reinspection would have to be scheduled, and then
 7    that could take however long.
 8              Sometimes they would ask for -- if
 9    there's a failure, they need a little bit of time
10    to fix it and then reschedule a couple of days or
11    week out.  If that inspection was passed, then we
12    could issue the certificate of compliance.
13              So it varies with the each application,
14    depending on the circumstance, and people could
15    fail twice.  So it just depends on their
16    situation, each application.
17         Q.   I think that's fair.  There's not a
18    requirement that it has to be completed in
19    30 days.  It just depends on how busy everyone is
20    and how fast you get your information in.
21         A.   Correct.
22         Q.   When the rental office is processing an
23    application under the RIPLA and -- again, let's go
24    back to this January 2024 time period -- is there
25    a specific process where they check the zoning
```

Kianca Guyton 11/3/2025

1    ordinances or how that property is zoned?

2        A.    It is on the application that they have

3    to put a zoning designation.  So the rental

4    compliance person doesn't always check to see what

5    the zoning is.  If the portion of the application

6    is missing, she can most certainly come to me and

7    ask what the zoning is.

8        Q.    Okay.  And I --

9        A.    Usually the resident would -- if they

10   were unsure, could call and ask what is the

11   property zoned.

12       Q.    I think that was certainly a question I

13   asked.  I think what I intended to ask, is there a

14   specific process where you take this is R1, let me

15   check that to make sure that that's the correct

16   use?  That may not make sense.

17       A.    What use are you referring to?

18       Q.    If you get -- if you get an application

19   and the person indicates that the property zoning

20   is R1 for that particular application, is there a

21   process where the City then goes and does any

22   review to make sure that yes, this is R1 property,

23   and yes, this qualifies to be in R1 zoning?

24       A.    Are you asking about whether a group

25   home or boarding house is allowed in this

Kianca Guyton 11/3/2025

1    particular zoning district?

2         Q.    I am not.  I'm asking just generally, is

3    there a process where you confirm that the zoning

4    laws are being complied with?

5         A.    So on the application, if there's more

6    than two unrelated persons, then that qualifies it

7    as a group home, and consistently, we do reach out

8    via letter, phone call or visit.  If they have

9    come in, we will let them know that this is a

10   boarding house/group home and they must come into

11   compliance.

12            So consistently, across the board, we

13   have not allowed for group homes.  And we speak

14   with the property manager or homeowner, and they

15   have come into compliance to meet our rental and

16   zoning ordinance.  So a portion of the application

17   must be that they meet -- that they abide by the

18   zoning ordinance, which would mean they could not

19   have a group home or boarding house.

20        Q.    And so one way, as I understand you're

21   telling me, that the City of Madison would check

22   that zoning compliance is to look at the number of

23   persons that are listed as going to have been

24   living on the property on the rental application?

25        A.    Yes.

Kianca Guyton 11/3/2025

1     Q.    Under RIPLA, if you get an application
2  and it's approved, you walked me through the
3  process a while ago of you've got to through an
4  inspection and all of these different things, and
5  then you get, I think you said, a certificate of
6  compliance.
7     A.    Yes.
8     Q.    If an application is not going to be
9  accepted, is there any type of denial letter that
10 is sent out?
11    A.    So we will send a letter to explain why
12 they are not in compliance.  So if we state that
13 there are more than two unrelated persons and then
14 constitutes a boarding house/group home, and we
15 let them know that they can -- they must, not can,
16 that they must call, come into our office so that
17 we can discuss and get that property into
18 compliance.
19    Q.    And would that process occur prior to
20 getting your certificate of compliance that you
21 spoke about?
22    A.    Yes.
23    Q.    The particular application that was
24 submitted by Baptist Homes, did Baptist Homes
25 receive any -- one of those letters that states,

Kianca Guyton 11/3/2025

1   you know, based on the rental application, you
2   would not be in compliance?
3         A.   No.  Immediately following this,
4   litigation -- they put in litigation regarding
5   this.
6         Q.   Okay.  And so as I understand your
7   testimony, Baptist Homes did not receive one of
8   the -- the letters you were describing stating
9   this is not in compliance because of the
10  litigation that was filed sometime thereafter?
11        A.   Yes, that, and they had already received
12  a letter stating that this was a boarding use and
13  it did not meet the zoning ordinance, and they
14  can't receive a certificate of compliance for
15  property if it's not meeting a zoning ordinance.
16        Q.   The letters that you spoke about that
17  would go out if an applicant was not in
18  compliance, did they go out from you, as the
19  community development director, or did they go out
20  from somebody in the rental office?
21        A.   I send them out as the director of
22  community development.
23        Q.   Okay.  I understand your testimony that
24  the lawsuit in this matter was filed -- and I
25  don't know the exact date, but --

Kianca Guyton 11/3/2025

```
 1              MR. SIMPKINS:  February 13th.
 2         Q.   (By Ms. Stringer)  February 13th.  So
 3    within a few weeks, a couple of weeks of the
 4    Rental Inspection and Property License Application
 5    for Baptist Homes.
 6              Can you give me, based on that, is there
 7    a current status for this rental application?  Is
 8    it just on hold?  Is it pending?  Is there a
 9    status we can attach to the Rental Inspection and
10    Property Licensing Application for Baptist Homes?
11              MR. SIMPKINS:  Let me instruct you not
12    to speculate, given that we're in litigation.  But
13    answer it if you can.
14              THE WITNESS:  We are in litigation, so
15    we have not issued a certificate of compliance,
16    no.
17         Q.   (By Ms. Stringer)  And you've not sent a
18    follow-up letter other than your June 1st, 2023
19    letter?
20         A.   It's my understanding that we have been
21    working with Baptist Homes for about six months
22    now.
23         Q.   Okay.
24              MR. SIMPKINS:  She means independent of
25    settlement discussions.
```

Kianca Guyton 11/3/2025

```
 1              THE WITNESS:  Oh, I'm sorry.  Would you
 2    restate your question?
 3         Q.   (By Ms. Stringer)  No, you're good.  And
 4    I'm trying to think the best way to ask this.  I
 5    think we're on the same page.  You have not -- and
 6    I understand no action has been taken since the
 7    lawsuit was filed.
 8              But I understand there's not been a
 9    certificate of compliance; is that correct?
10         A.   Yes.
11         Q.   There's not been this notice that is
12    sent out if you have a reason that you would not
13    be in compliance that you spoke about earlier?
14         A.   That is correct.
15         Q.   Okay.  So there has not been, really,
16    any decision made pending this litigation on the
17    Rental Inspection and Property Licensing
18    Application?
19              MR. SIMPKINS:  Object to the form of the
20    question.  Answer it if you can.  I think she's
21    asked and answered it once already.
22              THE WITNESS:  We are working with them
23    currently.
24         Q.   (By Ms. Stringer)  Okay.  And let's not
25    talk about anything that we've discussed
```

Kianca Guyton 11/3/2025

1    throughout the litigation.  I think we're on the
2    same page.  I understand without going into that.
3                There is a separate appeals process
4    under RIPLA.  And an appeals process, I think if
5    you -- let me ask you this and then we may can
6    avoid having to go through it.  The failure to
7    exhaust administrative remedies, the defense
8    that's been alleged, you testified earlier that
9    related to the zoning ordinances and the appeal
10   available there.  Does that include any -- is
11   there any second argument that Baptist Homes
12   should have made an appeal under RIPLA?
13               MR. SIMPKINS:  Object to the -- object,
14   calls for a legal conclusion and any answer to
15   that would be a result of discussion with counsel.
16   So I instruct you not to answer that.
17        Q.   (By Ms. Stringer)  Okay.  Are you
18   familiar with the appeals process under RIPLA?
19        A.   Yes.
20        Q.   And is that a separate appeals process
21   from the appeals -- administrative appeals process
22   under the zoning ordinances?
23        A.   I'd like to see a copy.
24        Q.   Sure.
25               (Exhibit 11 marked for identification.)

Kianca Guyton 11/3/2025

1        Q.    (By Ms. Stringer)  This is Bates
2   numbered Madison 1 through Madison 11.
3        A.    Thank you.
4        Q.    If you turn to page -- Madison 10 is the
5   Bates number, but it's page 7, and it's
6   paragraph 13, "Appeals."
7              Do you see that provision?
8        A.    Yes.
9        Q.    This appeals process, it mentions who
10  disagrees with a determination or order of the
11  building official under the RIPLA.  What would --
12  who is the building official under RIPLA?
13       A.    Billy Dean is our building official.
14       Q.    Is that a process -- this particular
15  process, if the City of Madison denies your rental
16  inspection application, is that what this appeals
17  process is for?
18       A.    Yes.
19       Q.    Is there anything -- I don't know what
20  determinations the building official may make.
21  Are there determinations a building official makes
22  as part of RIPLA?
23       A.    So a determination, some of the things
24  that they could appeal for would be the inspection
25  or determination by me that this is a group

Kianca Guyton 11/3/2025

```
 1    home/boarding house or being operated as a
 2    commercial use.  So they can make an appeal based
 3    on the interpretation/determination.  So that
 4    would be the appeals process.  And they can go to
 5    the mayor and board of aldermen stating their
 6    reasons for appeal.
 7          Q.   Okay.  For example, earlier you
 8    identified that the rental inspection office may
 9    look at how many persons are listed on the
10    application and you may, thereafter, send a letter
11    to an applicant stating this appears to be a
12    boarding home.
13          A.   Yes.
14          Q.   That would be appealable under
15    section 13, appeals process, of RIPLA?
16          A.   Yes.
17          Q.   And other things would be if an
18    inspection was done and the property owner
19    disagreed with the results of the inspection,
20    something like that?
21          A.   Yes.
22          Q.   And you stated that that appeal under
23    RIPLA also would go to the board of aldermen?
24          A.   Yes.
25          Q.   Separate from that appeals process, does
```

Kianca Guyton 11/3/2025

1    the board of aldermen have any involvement in
2    reviewing or approving a RIPLA application?
3         A.    I'm sorry, hold on just one second.
4    Will you ask the question you just asked again?
5         Q.    Yes.  Other than any involvement in the
6    appeals process that we just talked about, do the
7    board of aldermen have any role or involvement in
8    the processing of an application under RIPLA?
9         A.    No.
10        Q.    Does the planning and zoning
11   commission -- I may have asked you this earlier --
12   have a role in the processing of the rental
13   application under RIPLA?
14        A.    You did ask that, and the answer is no.
15        Q.    Let me do this just for clarity.  I may
16   have one more question.  I'm making sure.  I may
17   not.  I thought I had one more thing here.
18             I will do even better.  If I don't look
19   at every page, I'll walk away from here and there
20   will be an exhibit I didn't ask you about.
21             Ms. Guyton, I actually don't have any
22   more questions for you this morning.
23   EXAMINATION BY MR. SIMPKINS:
24        Q.    I have a couple of questions.
25             To your knowledge, did Baptist Homes

Kianca Guyton 11/3/2025

```
 1    appeal the failure to grant it a certificate of
 2    compliance at any time?
 3         A.   No, they did not appeal.
 4         Q.   You mentioned earlier the phrase "zoning
 5    verification letters."  Is that when someone plans
 6    to use a particular piece of property and they
 7    want to cooperate with the City of Madison, that
 8    they contact your department and get a
 9    verification of the proper zoning and use?
10         A.   That is correct.  They want to make sure
11    that that zoning fits in that zoning district and
12    they'd like a letter to that effect.  So that's
13    prior to purchasing the property.
14         Q.   In substance, your June 1st letter was a
15    zoning verification letter?
16         A.   Yes.  It was a determination of how that
17    property is classified, a zoning classification of
18    the property.
19         Q.   Let me get you to get the exhibit that's
20    2814, the zoning ordinance.  I want to you go
21    to -- I said 2814.  2802, please.
22              What does the very first part of
23    subsection 1 say there?
24         A.   "Duties of the zoning administrator,
25    also referred to as the planning and development
```

Kianca Guyton 11/3/2025

```
 1    director."
 2         Q.    And is that you that it's talking about?
 3         A.    Yes.
 4         Q.    Would you expect a lawyer who had
 5    practiced more than 30 years, had submitted zoning
 6    applications to another city and who had run for
 7    public office but not been elected to be able to
 8    read that and ascertain who the zoning
 9    administrator is?
10              MS. STRINGER:  Object to form.
11         Q.    (By Mr. Simpkins)  You can answer.
12         A.    I would fully anticipate that a lawyer
13    who practices zoning law and land use law would
14    know that.
15         Q.    What about a lawyer who doesn't practice
16    that but has gone through that process before?
17              MS. STRINGER:  Object to the form.
18              THE WITNESS:  Yes.
19              MR. SIMPKINS:  That's all I have.
20              MS. STRINGER:  Nothing further from me.
21                (Time Noted:  11:36 a.m.)
22                   SIGNATURE/NOT WAIVED
23    ORIGINAL:  MS. STRINGER, ESQ.
24    COPY:  MR. SIMPKINS, ESQ.
25
```

Kianca Guyton 11/3/2025

```
 1              CERTIFICATE OF DEPONENT
 2   DEPONENT:  KIANCA GUYTON
     DATE:  November 5, 2025
 3   CASE STYLE:  BAPTIST HOMES, INC. DBA SON VALLEY vs.
     CITY OF MADISON, MISSISSIPPI, A MUNICIPAL
 4   CORPORATION, AND JANE-JOHN DOES I-X
     ORIGINAL TO:  KELLY H. STRINGER, ESQ.
 5           I, the above-named deponent in the
     deposition taken in the herein styled and numbered
 6   cause, certify that I have examined the deposition
     taken on the date above as to the correctness
 7   thereof, and that after reading said pages, I find
     them to contain a full and true transcript of the
 8   testimony as given by me.
                 Subject to those corrections listed below,
 9   if any, I find the transcript to be the correct
     testimony I gave at the aforestated time and place.
10   Page      Line                  Comments
     ____      ____       _____
11   ____      ____       _____
     ____      ____       _____
12   ____      ____       _____
     ____      ____       _____
13   ____      ____       _____
     ____      ____       _____
14   ____      ____       _____
     ____      ____       _____
15   ____      ____       _____
     ____      ____       _____
16   ____      ____       _____
     ____      ____       _____
17
18           This the ____ day of _____, 2025.
19                          _____
                            KIANCA GUYTON
20   State of Mississippi
     County of _____
21
             Subscribed and sworn to before me, this the
22   _____ day of _____, 2025.
23   My Commission Expires:
24   _____     _____
25                                   Notary Public
```

Kianca Guyton 11/3/2025

1     CERTIFICATE OF COURT REPORTER

2    I, Robin G. Burwell, Court Reporter and

3 Notary Public, in and for the State of Mississippi,

4 hereby certify that the foregoing contains a true

5 and correct transcript of the testimony of KIANCA

6 GUYTON, as taken by me in the aforementioned matter

7 at the time and place heretofore stated, as taken by

8 stenotype and later reduced to typewritten form

9 under my supervision by means of computer-aided

10 transcription.

11    I further certify that under the authority

12 vested in me by the State of Mississippi that the

13 witness was placed under oath by me to truthfully

14 answer all questions in the matter.

15    I further certify that, to the best of my

16 knowledge, I am not in the employ of or related to

17 any party in this matter and have no interest,

18 monetary or otherwise, in the final outcome of this

19 matter.

20    Witness my signature and seal this the 5th

21 day of November, 2025.

22

23              _____

              ROBIN G. BURWELL, #1651

24             CRR, RPR, CCR

 My Commission Expires:

25 April 6, 2029