**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**BAPTIST HOMES, INC.**
**DBA SON VALLEY**                                                    **PLAINTIFF**

**v.**                                        **CAUSE NO. 3:24CV-00092-KHJ-MTP**

**CITY OF MADISON, MISSISSIPPI,**
**A MUNICIPAL CORPORATION, and**
**JANE-JOHN DOES I-X**                                        **DEFENDANTS**

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY**
**JUDGMENT OF DEFENDANT CITY OF MADISON, MISSISSIPPI**

The Plaintiff, Baptist Homes, Inc. d/b/a Son Valley ("Plaintiff" or "Baptist" or "Son Valley") is pursing claims under the Fair Housing Act ("FHA") and the Americans with Disabilities Act ("ADA"). The City of Madison ("City" or "Madison") is entitled to summary judgment as a matter of law, because Plaintiff prematurely filed this lawsuit without seeking to exhaust available administrative zoning remedies prior to filing suit. Even if it is determined that the suit is ripe for adjudication, Plaintiff cannot meet the burden of establishing a failure to accommodate under the FHA or ADA. Alternatively, the City of Madison respectfully requests the Court to grant it summary judgment as to the Plaintiff's punitive damage claim.

## STATEMENT OF FACTS

As permitted by Mississippi law, the City of Madison has an Official Zoning Ordinance ("Zoning Ordinance") that establishes comprehensive zoning regulations for the City and provides for the administration, enforcement, and amendment thereof. Sections of the Zoning Ordinance that are relevant to the issues raised in this suit are attached as Exhibit 1. The entirety of the Zoning Ordinance, as well as the City's Zoning Map, can be viewed on the City's website at https://www.madisonthecity.com.

On May 5, 2023, Baptist purchased a house located in Crescent Landing Subdivision at 405 Drayton Place in Madison, Mississippi ("Drayton Place house"). (*See* Ex. 2). Baptist purchased the Drayton Place house so Baptist's adult clients who have intellectual, developmental, or other disabilities could use it as a group home. (*See* Complaint, Doc. 1, ¶¶ 1, 8, 12). Currently, Baptist has four unrelated disabled adults ("the 4 residents") living in the Drayton Place house and "intends to lease" the house to those adults and "provide support services." (Doc. 1, ¶¶ 1, 9, 11, 13). It is undisputed that the Drayton Place house is located in a Residential District R-1 zone, as defined in the City's Zoning Ordinance. (Doc. 1, ¶ 14).

Article IX of the Zoning Ordinance sets forth the regulations governing a Single-Family Residential District (R-1). The purpose of that district is "to promote the preservation and establishment of areas of low density residential development with a minimum lot size of 15,000 square feet." (Ex. 1, Art. IX, § 9.01, p. 55). The only land use in R-1 that is relevant to this litigation is "[s]ingle-family detached dwellings with only one principal dwelling per lot." (Ex. 1, Art. IX, § 9.02 (a), p. 55). A single-family dwelling refers to "[a] detached residential building designed for occupancy by one family." (Ex. 1, Art. III, § 3.02, p. 9). The Ordinance defines a "family" as:

> One person living alone, or two or more persons living together as a single, housekeeping unit, whether related to each other legally or not, as distinguished from a group occupying a boarding house, lodging house, hotel, motel, dormitory or similar dwelling for group use. …

(Ex. 1, Art. III, § 3.02, p. 11). A "boarding house" is defined as a "building other than a hotel or motel, where, for compensation and by prearrangement for definite periods, meals and/or lodging are provided for three or more but not exceeding twelve persons (other than family members) on a weekly or monthly basis. (See also "Rooming House".)." (Ex. 1, Art. III, § 3.02, p. 6). The terms "lodging house" and "rooming house" are defined as "[a] building where lodging only is provided

for compensation to three or more, but not exceeding twenty (20) persons." (Ex. 1, Art. III, § 3.02, pp. 14, 18).

William "Bill" McCormack ("McCormack"), the Executive Director Emeritus for Baptist, was involved in the selection and purchase of Drayton Place house. (*See* Ex. 3, McCormack's Depo., p. 17: 1-12). McCormack testified in his deposition that prior to the purchase of the house, no one reviewed the City of Madison's zoning ordinance, rental ordinance, or zoning map. (Ex. 3, p. 28: 16-25; p. 29: 1-3). And, no effort was made to contact the City prior to purchasing Drayton Place house. (Ex. 3, p. 29: 1-3). On the other hand, Ronald Morton ("Morton"), an attorney who provides legal advice to Baptist and serves as the president of its board, claimed in his 30(b)(6) deposition that he read Madison's zoning and rental ordinances prior to identifying and purchasing Drayton Place house, but he did not look at the map or contact Madison. (*See* Ex. 4, Morton's 30(b)(6) depo., p. 8: 19-25; p. 9: 11-13; p. 72: 7-18; p. 92: 7-10).

Prior to the 4 residents moving in Drayton Place house, Baptist instructed Aaron Minor ("Minor") to obtain a fire inspection, which was necessary to obtain approval from the Department of Mental Health. (*See* Ex. 5, Minor's Depo., p. 11: 12-25; p. 12: 1-3; p. 28, p. 22-25). Minor has been a maintenance supervisor for Baptist since 2022. (Ex. 5, p. 9: 12-15). Minor called the Madison Fire Department, and he spoke with Kevin Miller ("Miller"), the Department's Fire Inspector. (Ex. 5, p. 13: 13-20). Minor advised that he was calling on behalf of Son Valley, and he requested Miller to inspect a house in Madison that was a group home that would have 5 or 6 people living there. (Ex. 5, p. 14: 20-25; p. 15: 1-7). Miller called Minor back the next day and told him that he could not inspect the property, because the City does not inspect houses. (Ex. 5, p. 14: 12-16). Son Valley located another company to conduct the fire inspection, and Minor was not involved in that process. (Ex. 5, p. 15: 19-23; 16: 1-2).

On or about June 2, 2023, Baptist submitted a Plan of Compliance for the Initial Certification Review of Son Valley at Drayton Place house for the purpose of obtaining approval from the Mississippi Department of Mental Health. (*See* Ex. 6, Certificate from DMH). On June 27, 2023, the Mississippi Department of Mental Health issued a Certificate of Operation to Son Valley for "Supervised Living" at Drayton Place, from June 2, 2023 to December 31, 2024. (*Id.*).

Following his conversation with Aaron Minor, Kevin Miller contacted Derrick Layton, the Fire Chief of the Madison Fire Department ("Chief Layton"), and he relayed the discussion that he previously had with Minor. (*See* Ex. 7, Chief Layton's 30(b)(6) Depo., p. 8: 16-21; p. 9: 8-16). Miller told Chief Layton that Minor had requested a fire inspection at Drayton Place house, because it was going to be a group home with residents and 24-hour staff. (Ex. 7, p. 10: 13-25; p. 11:1). Based on his conversation with Miller, Chief Layton considered the Drayton Place house a commercial building, because under the International Fire Code, a group home is listed as commercial property, which requires an inspection under the Code, as well as an inspection by Madison. (Ex.. 7, p. 12: 22-25; p. 13: 1-13; p. 22: 1-5; p. 46: 16-25; p. 47: 1-11). In addition, Chief Layton testified that the International Fire Code requires a group home to have a sprinkler system, fire alarm system, emergency lighting and other safety features set out in the Code. (Ex. 7, p. 47: 12-25). Based on Chief Layton's knowledge that Drayton Place house is located in a residential neighborhood, it raised a red flag for zoning, so he placed a call to Kianca Guyton to let her know that a fire inspection had been requested for a commercial group home. (Ex. 7, p. 17: 16-19; p. 19: 2-6; p. 23: 22-25; p. 24: 1-4; p. 46: 16-22).

Kianca Gutyon ("Guyton") is the Director of Community Development and Planning for Madison. (Ex. 8, Guyton's 30(b)(6) Depo., p. 9: 4:19). Guyton is also the zoning administrator, flood plain manager and the manager of the rental department for the City. (Ex. 8, p. 9: 20-25; p.

10: 1-10). In those roles, Guyton enforces the City's Zoning Ordinance and receives all applications for site plans, dimensional variances and conditional uses and presents that information to the Planning and Zoning Commission. (Ex. 8, p. 10: 9-18). Guyton serves as the liaison between the City's Mayor and Board of Aldermen in presenting that information and coordinates the applicants on the dates to attend those meetings. (Ex. 8, p. 10: 19-25).

Chief Layton told Guyton that Son Valley had requested a fire inspection for a group home in a residential area located at 405 Drayton Place, and he inquired as to whether the property owners had submitted an application for a zoning change. (Ex. 8, p. 24: 11-19). Guyton indicated that a group home was not zoned for that area, and she did not have an application for it. (Ex. 8, p. 25: 5-22).

After Chief Layton contacted Guyton, she conducted research to determine how Son Valley may be using the home. (Ex. 8, p. 14: 1-24; p. 16:1-11, 19-25; p. 17: 1-17). Her research showed that Son Valley is an organization that has a facility in Canton with a daycare and activities for persons who are intellectually disabled or require additional services. (Ex. 8, p. 16: 11-24). Based on the information provided by Chief Layton and her research of Son Valley, Guyton determined that the Drayton Place house use would be categorized under the City's Zoning Ordinance as multi-family, a group or boarding home, or medical facility. (Ex. 8, p. 18: 13-20).

On June 1, 2023, Guyton sent a letter to Baptist directed to McCormack. (*See* Ex.9, June 1, 2023 letter; Ex. 8, p. 14: 15-19). The letter stated the following:

> It was brought to our attention that this residence was purchased to be used as a multi-family, a medical facility or a boarding house. The property is currently zoned R-1 (Single-family residential). Multi-family or commercial uses are not an allowable use in this zoning district. Please contact me if you would like to further discuss this matter.

(Ex. 9).

Upon receipt of the letter, McCormack forwarded it to Morton. On or about June 9, 2023, Morton placed a call to Guyton to respond to her letter. (Ex. 4, p. 32: 22-25; p. 33: 1-7). Guyton testified that approximately a week or so after the June 1, 2023, letter, she spoke by phone with Morton. (Ex. 8, p. 21: 15-25; p. 22: 1-11). Morton advised that he had received the letter, and he wanted to clarify Son Valley's land use and how it would be utilizing the house. (Ex. 8, p. 22: 16-20). Morton explained that Son Valley is an organization that houses intellectually disabled persons, and he indicated that there would be four to five persons in the house, including a staff member who would be on site at all times to assist or support the residents as needed. (Ex. 8, p. 22: 12-25). Guyton advised Morton that based on their conversation, it was her determination that the house would be used as a boarding house/group home. (Ex. 8, p. 23: 3-5; p. 25: 9-20; p. 27: 19-23). Morton felt like Guyton's determination may have been inaccurate; nevertheless, Guyton stood on her determination that it was a group home/boarding house, but she indicated that she would speak with the City's legal counsel. (*Id.*).

Morton did not communicate with Guyton again until approximately six months later, when he called her on December 11, 2023. (Ex. 4, p. 33: 15-23). Morton told Guyton that he was following up and thought it would be helpful to meet with the City's attorney. (Ex. 8, p. 26: 19-25; p. 27: 1-9). Guyton advised Morton that he could certainly speak with or meet with the City's attorney. (Ex. 8, p. 27: 1-9). During the two phone conversations that Guyton had with Morton in June and December, he did not discuss Baptist's intent to lease the property to the residents and go through the rental application process with the City. (Ex. 8, p. 27: 10-18).

Following their telephone conversation on December 11, 2023, Morton wrote a letter to Guyton on December 14, 2023. (*See* Ex. 10, letter from Morton dated December 14, 2023); Ex. 8, p. 45: 15-24; Ex. 4, p. 33: 8-13). In the letter, Morton acknowledged the determination made by

Guyton in her June 1, 2023, letter that the Drayton Place house "was purchased to be used as multi-family, a medical facility, or a boarding house." (Ex. 10). For the first time, Morton advised that Baptist intended to lease the premises to the four unrelated individuals with disabilities who were residing together in the house. (Ex. 10). In the letter, Morton indicated that he had made two attempts to reach the City's attorney by leaving messages, but had not received a return call, and it was his understanding that Guyton was going to coordinate the meeting. (Ex. 10). Guyton did not recall ever telling Morton that she would be responsible for arranging a meeting with the City's attorney, and she definitely would not have told him that she would arrange a meeting with any City officials. (Ex. 8, p. 48: 3-25). In the letter, Morton advised that Baptist was ready to move forward with leasing the property, and they would be filing the necessary documents. (Ex. 10). In conclusion, Morton stated, "Insofar as the City has concluded that the lease of this premises to four developmentally disabled adults residing together as a single household unit is inconsistent with the property's R-1 zoning designation, please provide me with the basis for this conclusion, and consider this letter our formal request for a reasonable accommodation of that inconsistency." (Ex. 10). There was no mention that the request for accommodation was being made under the FHA or ADA. (Ex. 10; Ex. 4, p. 35: 23-25; p. 36: 1-11).

On or about January 29, 2024, Baptist submitted a Rental Inspection and Property Licensing Application to the City of Madison. (*See* Exs. 11 & 12, rental application checklist). Morton completed the rental application on behalf of Baptist. (Ex. 4, p. 46: 12-15). The application did not come to Guyton, and she did not see it. (Ex. 8,  p. 69: 1-10). Faith Funchess, a prior employee of the City, was the Rental Compliance Officer at that time. (Ex. 8, p. 11: 13-25; p. 12: 1-7). Rental properties fall under the Community Development Department. The time required to process rental applications varies with each application depending on the circumstances. (Ex. 8, p.

70: 5-25). At that time, typically, Guyton would not send the application to legal until she had received everything, however long that takes. (*Id.*). If there were no problems, the Rental Compliance Officer would schedule an inspection, which could be within the next week. (*Id.*; Ex. 8, p. 71: 1-16).

Two weeks later, on February 12, 2024, Morton sent an email to Chelsea Brannon ("Brannon"), the City's attorney. (*See* Ex. 14; Ex. 4, p. 50: 4-18). Morton stated that Baptist had purchased Drayton Place house with an intent to lease the premises, and a rental application had been filed with the City. (Ex. 14). He maintained that all that remained with regard to the application process was the inspection by the City. (Ex. 10). With regard to Madison's interpretation of zoning of the property, Morton stated the following:

> If the City has concluded that our intended lease of the premises to four developmentally disabled adults residing together as a single household unit is inconsistent with the property's R-1 zoning designation, as suggested in Kianca Guyton's letter dated June 1, 2023, please provide me with the basis for the City's conclusion, and consider this email as a second request for a reasonable accommodation of any such inconsistency. I remain available to discuss this matter with you and any other City officials. I believe an in-person meeting or meeting by phone would be most productive, however given that I have been unable to connect with you by leaving numerous phone messages, I am resorting to discussion via email. If you would like to speak by phone, my office number is … and my mobile number is …

(Ex. 14). The email was sent to Brannon at 4:53 p.m. (*Id.*)

The next day, on February 13, 2024, Baptist filed a lawsuit against Madison, and served Brannon with the summons and complaint on that same date. (Doc. 1; Doc. 4).

## THE COMPLAINT

In the complaint, Plaintiff is seeking damages and injunctive relief against the City of Madison for alleged violations of the FHA and ADA. In addition to monetary damages, Plaintiff requests the Court to enter an order granting the following relief:

    a.    Declaring that the actions of the Defendants described above constitute violations of the Fair Housing Act, as amended, 42 U.S.C. §§3601 et seq., and Title II of the Americans with Disabilities Act, 42 U.S.C. §§12131 et seq., and awarding relief pursuant to 42 U.S.C. §§1983 and 1988;

    b.    Enjoining Defendant City of Madison, Mississippi, its officers, employees, agents, attorneys, successors, and all other persons in active concert or participation with it, from discriminating on the basis of disability in violation of the Fair Housing Act and the Americans with Disabilities Act and pursuant to 42 U.S.C. §1983;

    c.    Enjoining Defendant City of Madison, Mississippi, its officers, employees, agents, attorneys, successors, and all other persons in active concert or participation with it, from failing to make reasonable accommodations and/or modifications in its policies, practices, rules or services, as required by the Fair Housing Act and the Americans with Disabilities Act, including accommodations that permit the making available of housing and provision of support services in housing for persons with disabilities.

    d.    Ordering the Defendants take all affirmative steps to ensure compliance with the Fair Housing Act and the Americans with Disabilities Act, including steps necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate to the extent practicable the effects of its unlawful housing practices as described herein.

(Doc. 1, pp. 13-14).

## LAW AND ANALYSIS

### A. Standard of Review

In *Mississippi v. Becerra*, the Court described the standard for summary judgment as

follows:

    "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'material' fact is one 'that might affect the outcome of the suit under governing law,' " *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)), and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party," *id.* (quotation omitted). If the movant initially shows the non-movant's case lacks support, then the non-movant must come forward with specific facts showing a genuine factual issue for trial. *Id.* In considering the record at

summary judgment, all evidence of the non-movant is to be believed, and all justifiable interferences are to be drawn in the non-movant's favor. *Id.*

*Mississippi v. Becerra*, 727 F.Supp.3d 559, 577 (S.D. Miss. Mar. 28, 2024).

**B. The Plaintiff's Claims are Not Ripe for Adjudication.**

The FHA and ADA both impose obligations to provide reasonable accommodations to individuals with disabilities to ensure equal access to housing and public services. *See Behavioral Health v. Grant Rd. Pub. Util. Dist.*, 902 F.3d 448, 459 (5th Cir. 2018) (reasonable accommodation claims under the FHA and ADA both require that a reasonable accommodation be provided if necessary to allow the individual to have usage and enjoyment in a facility equivalent to individuals who are not disabled). Courts often analyze claims under these statutes collectively, as they share similar legal standards and requirements. *Providence Behavioral Health*, 902 F.3d at 455 n.2.

Ripeness is a jurisdictional issue that must be decided before the case can proceed. *Groome Res., Ltd. v. Par. of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000). Courts in multiple jurisdictions have held that FHA and ADA reasonable accommodation claims are not ripe if the plaintiff fails to seek available local relief. Prior to suit, the courts require the plaintiff to exhaust administrative remedies to ensure a final decision has been made and to give local authorities an opportunity to accommodate before federal intervention. The consensus view among the federal courts, including the Fourth and Fifth Circuits, is that a plaintiff cannot satisfy the final decision rule without making at least one formal application to the relevant governmental entity, and Baptist has failed to do so in this case. *See, e.g.*, *Groome Res., Ltd. v. Par. of Jefferson*, 234 F.3d 192, 199-200 (5th Cir. 2000) (court held that plaintiff's reasonable accommodation claim was ripe after plaintiff sought a variance and defendant "constructively" denied the request in failing to act on it); *Bryant Woods Inn, Inc. v. Howard County, Md.*, 124 F.3d 597, 602 (4th Cir. 1997) (court recognized that county

must be afforded an opportunity to make a final decision, and plaintiff sought and was denied a variance; therefore, the accommodation had been denied, and the issue was appropriate for judicial resolution without invoking post-decisional procedures).

The Seventh Circuit recently addressed the issue of ripeness in the context of claims for injunctive relief under the ADA and the Rehabilitation Act in *Chosen Consulting, LLC v. Town Council of Highland*, 148 F.4th 451, 2025 U.S. App. LEXIS 19318 (7th Cir. 2025). The plaintiffs in *Chosen Consulting* alleged that the town and town officials discriminated against patients with addiction-related ailments by "refusing to provide a letter" confirming that the plaintiff's proposed use of its property complied with the town's zoning requirements. The Seventh Circuit affirmed the district court's summary judgment ruling in favor of the town upon finding that the claim was not ripe for adjudication.

The circumstances of *Chosen Consulting* closely parallel those presented here. In April 2019 Chosen purchased a property in Highland, Indiana that historically operated as a nursing home and began transitioning it to primarily treat patients with addiction-related ailments. In order to do so, Chosen had to secure a new license from the Indiana Family and Social Services Administration, which required a letter from the town stating that its proposed use satisfied local zoning requirements. In July 2019, the town's building commissioner and a town councilman informed Chosen that it needed to apply for a use variance or rezoning to convert the facility, which would require Chosen to apply to the board zoning appeals for a recommendation that would then be forwarded to the town council. Chosen did not seek a variance, but instead requested a letter "affirming" that its proposed use conformed with the property's alleged "existing legal nonconforming use." The town did not issue the requested letter; however, in May 2020 the town's attorney emailed a "draft letter" which stated that the proposed use was permitted as a legal non-

conforming use. Chosen was advised by the attorney that he did not have approval to send the letter; therefore, Chosen could not rely on it. A final letter was never issued. In June 2020, Chosen emailed a town councilman and requested a call to "understand where we are in the process." The councilman responded that he did not know where the process was, because nothing had happened, and there was nothing on the docket of their board of zoning appeals. He indicated that he was leaving it to the lawyers. Chosen filed suit in June 2020 without pursuing the variance or rezoning processes suggested by town officials.

The Court in *Chosen Consulting* applied the "finality requirement" established in *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S. Ct. 3108 (1985) and clarified in *Pakdel v. City & Cty. of S.F.*, 594 U.S. 474, 141 S. Ct. 2226 (2021). *Chosen Consulting*, 2025 U.S. App. LEXIS 19318, at *16. The Court found that in order to satisfy the "relatively modest" finality requirement, a plaintiff must demonstrate "[t]hat there is no question about how the regulations at issue apply to the particular land in question;" and the "government must be committed to a final, conclusive position." *Id.* (internal quotations and citations omitted). The Court emphasized that if "avenues still remain for the government to clarify or change its decision, the finality requirement is not satisfied," and the claim is not ripe for judicial review. *Id.* The Court found that the finality requirement in *Chosen Consulting* had not been met because the town council had not issued the requested letter authorizing the proposed use of the property, and the plaintiff had not exhausted the procedures necessary to enable the town to make a final decision. *Id.* at *17. The Court pointed out that Chosen had to take the necessary steps to attempt to obtain the town's approval of its proposed use, and until it did so, "it is mere speculation whether [Chosen] even has an injury to complain of." *Id.* In conclusion, the Court rejected Chosen's arguments that the attorney's letter was a final statement as to what the town's decision would be

and that the town's failure to issue the requested letter prior to any application by Chosen constituted a final decision. *Id.* at *18-19; *see also Smith & Lee Assocs. v. City of Taylor*, 13 F.3d 920, 929-30 (6th Cir. 1993) (city's refusal to issue a permission letter did not constitute a denial of a request for reasonable accommodation under the FHA, because council had no authority under city's zoning ordinance to authorize an inconsistent land use by letter; decision must be made by an elected body).

Courts considering the ripeness of claims brought under the FHA and ADA for failure to accommodate have held that the claims are not ripe until the appropriate administrative procedures have been utilized. *See e.g., Common Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 119 (2nd Cir. 2014) (finding plaintiffs' ADA claims were not ripe, because they had not pursued all available remedies, such as seeking a variance); *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 578-79 (2nd Cir. 2003) (requiring plaintiffs to pursue facially neutral procedures and request variance for accommodation from the fire code was not a failure to accommodate plaintiffs' handicaps, because prior to incurring liability, a governmental entity is entitled to know what a plaintiff is actually seeking); *Thompson v. Borough of Munhall*, 44 F. App'x 582, 583-84 (3rd Cir. 2002) (finding FHA claim was not ripe and court lacked subject matter jurisdiction, because although plaintiff sought and was denied a rezoning request, there was no final decision on the land, because plaintiff still had the option of seeking a variance).

The rationale for requiring a final decision with regard to claims for failure to accommodate under the FHA and ADA was articulated by the Eighth Circuit in *Oxford House-C v. City of St. Louis*, 77 F.3d 249 (8th Cir. 1996), wherein the Court stated the following:

> The City has consistently said it cannot make an exception to the zoning code unless the Oxford Houses apply to the City's Board of Adjustments for a variance, . . . and the Oxford Houses refuse to apply. **Their refusal is fatal to their reasonable accommodation claim**. The Oxford Houses must give the City a chance to

13

accommodate them through the City's established procedures for adjusting the zoning code. The Fair Housing Act does not insulate [the Oxford House residents] from legitimate inquiries designed to enable local authorities to make informed decisions on zoning issues. Congress did not intend for the Act to remove handicapped people from the normal and usual incidents of citizenship, such as participation in the public components of zoning decisions, to the extent that participation is required of all citizens whether or not they are handicapped. In our view, Congress also did not intend the federal courts to act as zoning boards by deciding fact-intensive accommodation issues in the first instance.

*Oxford House-C*, 77 F.3d at 253 (emphasis added) (internal citations and quotations omitted).

The Court made a similar ruling in *Oxford House-A v. City of Univ. City*, 87 F.3d 1022 (8th Cir. 1996), in addressing the issue of failure to exhaust administrative remedies in the context of a claim under the FHA. As in *Oxford House-C*, the plaintiffs in *Oxford House-A* brought suit against the city prior to exhausting available local procedures, and the Court held that the lawsuit was "entirely premature" and should have been dismissed without prejudice. *Oxford House-A*, 87 F.3d at 1025. The Court rejected the plaintiffs' argument that the premature lawsuit was necessary to stop the city from intentionally discriminating against the residents and threatening them with eviction and, in doing so, pointed out the following:

First, it is premised upon a self-inflicted wound. Oxford House signed a lease, moved two residents into the home without obtaining an occupancy permit, and declared its intent to violate the zoning ordinance by moving a total of ten unrelated residents into the home. **Apparently, this is part of a nationwide Oxford House strategy to ignore local laws that treat its residents differently than members of a biological family, and to present local zoning officials with a *fait accompli* by moving into a residential neighborhood without seeking prior approval**.

*Id.* (emphasis added). The parallels between Oxford House and Baptist Homes cannot be denied.

In *United States v. Vill. of Palatine*, 37 F.3d 1230 (7th Cir. 1994), a group home for recovering alcoholics and substance abusers requested an accommodation under the FHA to continue operating in its current condition, but refused to apply for a special use approval under the village's zoning ordinance. The Seventh Circuit found that in order to have a ripe claim, the

village must be afforded an opportunity to make the requested accommodation pursuant to its own lawful procedures, "unless it is clear that the result of such procedures is foredoomed." *Id.* at 1234.

The court's analysis in *Chosen Consulting*, *infra*, and the other cases discussed above, underscore the principle that ripeness requires a concrete and final decision by the government, ensuring that judicial intervention does not occur prematurely or in the absence of a definitive administrative action. Like the plaintiff in *Chosen Consulting*, Baptist did not obtain a final decision from the City of Madison or avail itself of available administrative remedies prior to prematurely filing suit.

Article XXVIII of the City's Zoning Ordinance prescribes "the legal devices and procedures for administering and enforcing" the Ordinance and defines "the duties, powers, limitations and scope of jurisdiction for the various persons and groups which are concerned with the administration and enforcement of" the Ordinance. (Ex. 1, Art. XXVIII, § 28.01, p. 143). The duties of the Zoning Administrator, also referred to as "Planning and Development Director," are set forth in Section 28.02. (Ex. 1, Art. XXVIII, § 28.02, p. 143). Those duties include: "(p) Provide administrative interpretation as provided in Subsection 28.02." (Ex. 1, Art. XXVIII, § 28.02 (1)(p), p. 143).

It is undisputed that the Drayton Place house is zoned R-1 single family residence. (Ex. 4, p. 32: 6-8). On June 1, 2023, Guyton, the City's Zoning Administrator, who is also the Director of Community Development, wrote Baptist and advised that the Drayton Place house was considered a group home/boarding house. (Ex. 9). Her position was solidified in a conversation with Morton, shortly after he received the letter. (Ex. 8, p. 23: 3-5; p. 25: 9-20; p. 27: 19-23).

Baptist could have requested a zoning verification letter prior to purchasing the Drayton Place house, as is frequently done by a prospective buyer. (Ex. 8, p. 82: 4-13). In substance,

Guyton's June 1, 2023, letter issued to Baptist was a zoning verification letter. (Ex. 8, p. 82: 14-18). It was a determination of the zoning classification of the property. (*Id.*). The determination expressed by Guyton in the letter was her administrative interpretation as the Zoning Administrator, and that interpretation was subject to appeal. (*See* Ex. 1, Art. XXVIII, § 28.14 (.1)); Ex. 8, p. 34: 18-25; p. 35: 6-25; p. 36: 1-8; p. 40:18-25; p. 41: 1-8).

The process for appeals from the administrative interpretation of the Zoning Ordinance is clearly set forth in § 28.14 which states, in relevant part, "[i]n accordance with Section 28.02.02 of this Ordinance, any party aggrieved with the administrative interpretation of the Zoning Administrator shall have the right to appeal such interpretation. Such appeals may be made directly to the Mayor and Board of Aldermen, or the appeal may be made to the Planning Commission." (Ex. 1, Art. XXVIII, § 28.14 (.1)).

Morton testified in his deposition, that Baptist does not believe that a reasonable accommodation is necessary in this case, because they believe that the living arrangements at Drayton Place house fit within the terms of the statutes or the ordinances. (Ex. 4, p. 26: 9-15). In other words, Baptist disagrees with Guyton's interpretation of the Zoning Ordinance. Yet, Baptist did not seek to appeal the decision and, as a result, no final decision was made by the City. (Ex. 4, p. 81: 24-25; p. 82: 1-3).

Although Morton disputes that Baptist received an administrative interpretation of the land use, he admitted that if Baptist had received an administrative interpretation from the Zoning Administrator, then the next step would have been to take it to the City's Board of Aldermen. (Ex. 4, p. 41:19-25). Morton further recognized that the Board of Alderman acts as an appeal body, and he could have presented a fulsome finding of facts, evidence and documents to the Board in appealing the interpretation. (Ex. 4, p. 43: 5-18; p. 44: 1-4). While Morton acknowledged that a

conclusion (i.e., a zoning interpretation) had been made by Guyton, the Director of Community Development, he claimed that Baptist could not have availed itself of the appeal process, because it had not received an appealable administrative interpretation from the City's "Zoning Administrator," as required in the Ordinance. (Ex. 4, p. 39: 15-25; p. 40: 3-25; p. 65: 8-25; p. 66: 1-20). It cannot be disputed that Guyton is the City's Zoning Administrator, as it is stated in the Zoning Ordinance, which Morton claimed that he read. (*See* Ex. 1, Art. XXVIII, § 28.02 (.1) ("Duties of the Zoning Administrator (Also Referred to as Planning and Development Director)"). Regardless, even if Morton thought the zoning administrator was a person other than Guyton, he admitted that he did not make any effort to find out who the zoning administrator was or to try to send a letter to request an interpretation or final decision. (Ex. 4, p. 40: 8-25; p. 41: 1-5). Baptist's failure to do so is fatal to its claims for reasonable accommodation.

C. **Plaintiff's FHA and ADA Claims for Failure to Accommodate Fail as a Matter of Law.**

In a failure-to-accommodate claim, a plaintiff bears the burden of proof in establishing four factors: "(1) the residents of the affected dwelling or home suffer from a disability, (2) they requested an accommodation from the defendant, (3) the requested accommodation was reasonable, and (4) the requested accommodation was necessary to afford the residents equal opportunity to use and enjoy the home." *Women's Elevated Sober Living L.L.C. v. City of Plano*, 86 F.4th 1108, 1112 (5th Cir. 2023). As set forth herein, no reasonable juror could find that Plaintiff has met any of the elements, other than the first prong.

As an initial matter, Baptist did not request a reasonable accommodation under the FHA or ADA, as required by the second factor. In fact, Morton testified in his deposition, that Baptist does not believe that a reasonable accommodation is even necessary in this case, because they believe that the living arrangements of the four residents at Drayton Place house fit within the terms of the statutes and Madison's Zoning Ordinance. (Ex. 4, p. 26: 9-15). In June 2023, Guyton advised

Morton that it was her determination that Son Valley would be using Drayton Place house as a group home/boarding house. (Ex. 8, p. 22: 12-25; p. 23: 3-5; p. 25: 9-20; p. 27: 19-23; Ex.9). Although Morton disagreed with that interpretation, he waited until 6 months later to follow up with Guyton. Morton wrote a letter to Guyton on December 14, 2023, and stated "[i]nsofar as the City has concluded that the lease of this premises to four developmentally disabled adults residing together as a single household unit is *inconsistent* with the property's R-1 zoning designation, please *provide me with the basis for this conclusion*, and consider this letter our *formal request for a reasonable accommodation of that inconsistency.*" (Ex. 10 (emphasis added)). There was no mention that the request for accommodation was being made under the FHA or ADA, much less why such request was reasonable and necessary. (Ex. 10; Ex. 4, p. 35: 23-25; p. 36: 1-11). Guyton testified that at that time, she thought that Morton was referring to an accommodation for a variation of the Zoning Ordinance through a variance, special exception or conditional use. (Ex. 8, p. 52: 14-24; p. 53: 1-25). She indicated that the City had not had a prior request for a reasonable accommodation under the FHA or ADA, and she did not understand that a "reasonable accommodation" was tied to those Acts. (Ex. 8, p. 53: 21-25; p. 58: 23-25; p. 59: 1-4). Morton made a similar request in his February 12, 2024 email, again without referencing the FHA or ADA. (Ex. 14). Suit was filed the next day.

Even if it is determined that Baptist made a request for an accommodation under the FHA or ADA, Baptist has produced no evidence to establish that such request is "necessary" as required by the fourth factor. Morton testified that the 4 residents currently staying at Drayton Place house previously resided in a supervised living house located on Saratoga Street in Jackson, MS ("Saratoga House"). It operated under separate lease agreements that had been approved by the Department of Mental Health as part of the certification process. (Ex. 4, p. 58: 17-25; p. 59: 1-2).

McCormack testified that Baptist wanted to get out of Jackson, and the logical place to move was north, so they began looking in areas in Madison County, such as Madison and Gluckstadt. (Ex. 3, p. 17: 13-24). Baptist still owns the Saratoga House, and Morton testified that Baptist is still charging the 4 residents rent for the Saratoga House, while they are living at the Drayton Place house as "guests." Ex. 4, p. 59:12-19; p. 61:1-7, 16-18). Baptist did not make any effort to lease or sell the Saratoga House, because Baptist wanted to preserve the location. (Ex. 4, p. 61: 24-25; p. 62: 1-25). Morton indicated that the 4 residents still have the ability to live at Saratoga House, and if they do not prevail in this suit, then the 4 residents will return to the Saratoga House. (Ex. 4, p. 59:12-19).

The Fifth Circuit provided the following guidance for determining the necessity of a request for accommodation:

> We must evaluate necessity considering its definition, that is, something **"[i]ndispensable, requisite, essential, needful; that cannot be done without, or absolutely required."** (citation omitted). A requested accommodation from capacity restrictions must directly ameliorate the effect of the plaintiffs' disabilities, such that the requested number must reside together in a dwelling to achieve effective amelioration of their afflictions. *See* 42 U.S.C. § 3604(f)(3)(B). Put another way, without the requested accommodation, the ameliorative benefit provided must be so insignificant that it deprives persons with disabilities from the opportunity to use and enjoy the dwelling of their choice as compared to those without disabilities. (citations omitted).

*Women's Elevated Sober Living L.L.C. v. City of Plano*, 86 F.4th 1108, 1112 (5th Cir. 2023) (emphasis added). The Court emphasized that "a requested accommodation that is preferable to an alternative is not sufficient; it must be essential." *Id.* at 1112. Based on the above facts, Plaintiff has not, and cannot establish necessity in this case.

### D.  Plaintiff's Punitive Damage Claim Should be Dismissed.

The City is entitled to summary judgment as to Plaintiff's request for punitive damages under 42 U.S.C. § 3613 (c)(1) and 42 U.S.C. § 1983. In *Newport v. Fact Concerts*, 453 U.S. 247,

101 S. Ct. 2748 (1981), the Supreme Court established the general rule that no punitive damages are allowed against a municipality "unless expressly authorized by statute." *Newport*, 453 U.S. at 260 n.21, 101 S. Ct. at 2756. The Court in that case specifically held that "a municipality is immune from punitive damages under 42 U.S.C. § 1983" *Newport*, 453 U.S. at 271, 101 S. Ct. at 2762; *see also Webster v. City of Houston*, 689 F.2d 1220, 1228-29 (5th Cir. 1982) (relying on *Newport*, court reversed punitive damage verdict against city for alleged violations of 42 U.S.C. §1983); *see also Barnes v. Gorman*, 536 U.S. 181, 189, 122 S. Ct. 2097, 2103 (2002) (Supreme Court held that punitive damages are not recoverable under the ADA).

Plaintiff's request for punitive damages under the FHA also fails. Section § 3613 (c)(1) of the FHA provides that a court may award a "plaintiff actual and punitive damages." 42 U.S.C. § 3613 (c)(1). However, the statute does not "expressly authorize" an award of punitive damages against a municipality. In *L&F Homes & Dev. v. City of Gulfport*, Civil Action No. 1:10cv387HSO-JMR, 2011 U.S. Dist. LEXIS 131976 (S.D. Miss. Nov. 15, 2011), the Court, relying on the Supreme Court's decision in *Newport*, found that punitive damages against the City of Gulfport were not recoverable under the FHA. *L&F Homes,* 2011 U.S. Dist. LEXIS 131976, at *6-7. Courts in other jurisdictions have also found that the FHA does not authorize the imposition of punitive damages on a municipality. In *Inland Mediation Bd. v. City of Pomona*, 158 F. Supp. 2d 1120 (C.D. Calif. 2001), the plaintiff argued that the City of Pomona was subject to punitive damages, because Congress had generally authorized punitive damages under the FHA and did not provide an exception for municipalities. In rejecting that argument, the court held that under *Newport*, "Congress must expressly authorize awards of punitive damages against municipalities," and the "FHA's general provision regarding the availability of punitive damages" is not sufficient. *Inland Mediation Bd.*, 158 F. Supp. 2d at 1158; *see also Brooks v. Seattle Hous. Auth.*, No. C 12-0878-

JCC, 2013 U.S. Dist. LEXIS 143451, at *3 (W.D. Wash. Oct. 1, 2013) (general authorization of punitive damages in the FHA does not meet the *Newport's* requirement of an express authorization of punitive damages against municipalities); *Jennings v. Hous. Auth. of Balt. City*, No. WDQ-13-2164, 2014 U.S. Dist. LEXIS 11045, at *37 (same); *Alamar Ranch, Ltd. Liab. Co. v. Cty. of Boise*, No. CV 09-04-S-BLW, 2010 U.S. Dist. LEXIS 40978, at *21 (D. Idaho Apr. 27, 2010) (same). Even if this Court should decide that punitive damages under the FHA can be recovered against a municipality, the City is still entitled to summary judgment as to Plaintiff's punitive damage claim, because the undisputed facts in this case do not illustrate that the City exhibited a gross disregard for the Plaintiffs' rights.

This, the 17th day of November, 2025

Respectfully submitted,

**CITY OF MADISON, MISSISSIPPI,
A MUNICIPAL CORPORATION**

BY:    _s/ Kelly D. Simpkins_____
Kelly D. Simpkins (MSB #9028)
One of Its Attorneys

OF COUNSEL:

Kelly D. Simpkins (MSB #9028)
Lana E. Gillon (MSB #9548)
WELLS MARBLE & HURST, PLLC
300 Concourse Boulevard, Suite 200
Ridgeland, Mississippi 39157
Post Office Box 131
Jackson, Mississippi 39205-0131
Telephone:    (601) 605-6900
Facsimile:    (601) 605-6901
ksimpkins@wellsmarble.com
lgillon@wellsmarble.com
*Special Counsel for the City of Madison,
Mississippi*

Chelsea H. Brannon, Esq.
1004 Madison Avenue
Madison, Mississippi 39110
Post Office Box 40
Madison, Mississippi 39130
Telephone:  (601) 856-7116
Facsimile:  (601) 853-4766
cbrannon@madisonthecity.com
*Counsel for the City of Madison, Mississippi*

/# 295497